Scott D. UPTEGRAPH Jr. and Kara K. Uptegraph, Appellants,

v.

SANDALWOOD CIVIC CLUB, Appellee.

No. 01–07–00764–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Feb. 5, 2010.

N. Kimberly Hoesl, Doyle, Restrepo, Harvin & Robbins, L.L.P., Stephen H. Lee, Porter & Hedges, L.L.P., Houston, TX, for appellants.

Rodney J. Reynolds, Pillsbury Winthrop Shaw Pittman LLP, Houston, TX, for appellee.

Panel consists of Chief Justice RADACK and Justices SHARP and TAFT.*

## OPINION

TIM TAFT, Justice (Retired).

Scott Uptegraph Jr. and Kara K. Uptegraph appeal from a final judgment awarding Sandalwood Civic Club ("Sandal-

---

* Justice Tim Taft, who retired from the First Court of Appeals effective June 1, 2009, continues to sit by assignment for the disposition of this case, which was submitted on May 26, 2009.

wood CC") injunctive relief to enforce its restrictive covenants, a declaratory judgment affirming its authority to enforce the restrictive covenants, damages pursuant to section 202.004(c) of the Texas Property Code,[1] costs, attorney's fees, and pre- and post-judgment interest. In three issues, the Uptegraphs assert that (1) the trial court misinterpreted the Sandalwood subdivision deed restrictions, (2) there is insufficient evidence to support the trial court's findings of facts and conclusion of law that Sandalwood CC acted reasonably in denying the Uptegraphs' fence plans and denying an exception to the deed restriction, and (3) the trial court erred in assessing damages under section 202.004(c) without evidence of actual injury or harm.

We affirm.

## Background

In June of 2004, the Uptegraphs bought a lot with house on the corner of Sandalwood Drive and Beechmont Road in the Sandalwood subdivision, located in the Memorial area of the city of Houston, Texas. The Sandalwood subdivision is subject to deed restrictions—enforced by Sandalwood CC—which include specific setback requirements governing the placement of structures on each lot. The recorded plat for the Uptegraph property depicts a 25–foot building setback line along the side of the lot facing Sandalwood Drive and a 10–foot building setback line along the side facing Beechmont Road. The Architectural Control Committee (ACC), which operates independently from Sandalwood CC, governs building approvals within the Sandalwood Subdivision.

After the Uptegraphs purchased their property, they made plans to replace the existing house, which faced Sandalwood Drive, with a new one that would face Beechmont Road. They submitted a set of proposed plans for the new house to the ACC in July 2004. This first set of plans depicted (1) a 15–foot building line along Sandalwood Drive and a 25–foot building line along Beechmont Road, (2) a proposed fence on the Sandalwood Drive side of the lot that enclosed the backyard, but not the motor court, and was further away from Sandalwood Drive than the 25–foot setback line depicted in the recorded plat, and (3) a proposed three-car garage that was set back approximately 16 feet from the Sandalwood Drive side of the lot, and closer to the street than the 25–foot setback line depicted in the recorded plat. The plans were rejected by the ACC because the proposed three-car garage was closer to the street than the 25–foot setback line for the Sandalwood Drive side of the lot. The Uptegraphs' builder subsequently sent a letter to the ACC explaining that he mistakenly thought that, based on the frontage change, the setback line originally applicable to Beechmont Road would become applicable to Sandalwood Drive. In other words, the builder assumed that the setback lines reflected on the plat were relative to the orientation of the house, rather than to a particular street, and so subject to change if the orientation of the house changed.

In October 2004, the Uptegraphs submitted a second set of proposed plans to the ACC. This second set of plans depicted (1) a 25–foot building line along Sandalwood Drive and 10–foot setback line on Beechmont Road, consistent with the building lines depicted in the recorded plat, (2) the same fence enclosing the backyard as in the first plans, further back from the street than the 25–foot setback line depicted on the plat, and (3) a two-car garage built further away from the street

1. Tex. Prop.Code Ann. 202.004(c) (Vernon 2007).

than the 25-foot setback line depicted on the plat. The ACC approved these proposed plans on October 19, 2004.

A year later, in late October 2005, an ACC member drove by the Uptegraph lot and saw a wrought iron fence being constructed that appeared to be significantly outside of the setback line, almost to the street. Unbeknownst to the ACC, the Uptegraphs had had a survey drafted earlier that month that depicted a significant change in the location of the previously-approved fence enclosing the back yard. As depicted on the new survey, the fence was to be moved much closer to Sandalwood Drive, enclosing not only the back-yard, but the motor court and a large portion of the yard on the Sandalwood Drive side of the property as well, bringing the fence much closer to the street than the 25-foot building line for the San-dalwood Drive side of the lot. The ACC sent a letter to the Uptegraphs on October 23, 2005, advising them to stop construction on the fence because it was closer to the street than the 25-foot setback line applicable to that side of the property and because no plans for this fence in such a location had been approved by the ACC. The Uptegraphs temporarily stopped construction on the fence and submitted a set of plans for the fence under construction to the ACC on October 25, 2005. This set of plans, the third set of plans overall, depicted (1) the originally approved fence enclosing the back yard, (2) a new proposed wrought iron fence between the end of the garage and motor court and the Sandal-wood Drive side of the property, much closer to the street than the 25-foot setback line along Sandalwood Drive, (3) a new sidewalk leading from Sandalwood Drive to a gate in the new fence, and (4) a widened driveway. After reviewing the plans, the ACC rejected them. Although the Uptegraphs' builder had been verbally notified of the ACC's rejection of the

plans, the Uptegraphs completed the construction of the new fence. On November 2, 2005, the ACC sent a letter to the Uptegraphs' builders, with a copy to the Uptegraphs, explaining that the new fence did not comply with the setback specified by the Sandalwood deed restrictions, that construction began without approval of the revised site plan—which itself was a violation of the deed restrictions, and that a concrete sidewalk and driveway that were not part of the approved plan were now installed. The letter advised submission of revised site plans and concluded by noting that the builders completed the fence after the ACC informed them of the rejection of the plans, and consequently, the Sandal-wood CC Board of Directors (the "Board") considered the builder to be in non-compliance and would proceed with further steps to obtain compliance with the deed restrictions.

On November 7, 2005, the Uptegraphs submitted a fourth overall set of plans, the second set pertaining to the newly designed fence and driveway, to the ACC. This set of plans again depicted (1) the originally approved fence enclosing the back yard, (2) the newly constructed wrought iron fence that was much closer to the street than the 25-foot setback line along Sandalwood Drive, (3) a new sidewalk leading from Sandalwood Drive to a gate in the new fence, and (4) a widened driveway; the plans also now included required vegetation-to-concrete ratios. The ACC approved the new concrete portions of the plan, but rejected the portion of the plans that showed the newly constructed fence because it was closer to the street than the 25-foot setback line. The Board voted to enforce the ACC's rejection of the fence, but sought a meeting with the Upte-graphs to try to resolve the issue.

A meeting occurred between representatives from the Board, the ACC, and the

Uptegraphs on November 28, 2005, at the Uptegraphs' lot. Mr. Uptegraph shared his concern that the currently permitted configuration—the second set of plans which was approved by the ACC on October 19, 2004—would not allow him to maneuver his SUV into the garage. Alternative fencing arrangements were discussed that would not violate the deed restrictions, but no agreement was reached, and the Board subsequently sent the Uptegraphs a letter, dated December 15, 2005, summarizing the events that had transpired with regard to the fence. The letter pointed out that the ACC had approved the plans submitted by the Uptegraphs for a compliant fence, but the Uptegraphs had proceeded to build a fence that was non-compliant and that had not been approved by the ACC. The letter notified the Uptegraphs that the Board would sue within 30 days of the Uptegraphs' receipt of the letter, if the fence that was closer than 25 feet to Sandalwood Drive was not removed. Mr. Uptegraph responded by requesting a hearing before the Board.

On February 2, 2006, Jack Reynolds, attorney for the Board, sent a letter notifying the Uptegraphs that the hearing had been scheduled for February 15th and that, if the Board ruled against them, the fence would have to be removed no later then March 18, 2005, or a suit would be filed. At the hearing, Mr. Uptegraph stated that he wanted the fence for the safety of his children. After discussing the matter, the Board voted to deny the Uptegraph's appeal of the decision of the ACC and to require the Uptegraphs to remove the portion of the fence that was closer to the street than the setback line.

Reynolds sent a letter to Stephen Lee, counsel for the Uptegraphs, on February 16, 2006, notifying him of the decision reached by the Board. The letter reiterated that the Uptegraphs had until March 18, 2006, to remove the portion of the fence that was closer to the street than the setback line or a suit would be filed seeking injunctive relief, attorney's fees, court costs, and damages of up to $200 per day of the violation. Reynolds further expressed that, if the Uptegraphs wanted to replace the existing non-compliant fence with one that complied with the restrictive covenants and the setback line, they could file an application with the ACC for its consideration.

Almost a month later, on March 14, 2006, Lee replied that the Uptegraphs objected to the procedure implemented by the Board because the entire Board was not present for their appeal[2] and the Uptegraphs demanded that the entire Board convene a meeting at the earliest available time to allow them to present their appeal to the entire Board. Attached to Lee's letter was a fifth overall set of plans, the third pertaining to the fence in question, depicting the location of fences that the Uptegraphs intended to erect on their property if their appeal was denied. In these plans, the Sandalwood Drive fence was located further from the street than the setback line. The plans also contained, for the first time, a fence on the Beechwood Road side of the lot. The letter also stated that the plans were being submitted without waiver of the Uptegraph's contention that the Board's action had been improper.

Reynolds replied to Lee by letter the following day, stating that there would be no additional meeting with the Board and that the Board's last decision stood. Reynolds added that he had forwarded the plans to the ACC and, if the Uptegraphs

---

2. Although several members of the Board had been absent, more than a quorum of the Board had been present for the hearing and vote on the Uptegraphs' appeal.

would agree in writing, prior to March 18, 2006, that if the plans were approved, they would immediately commence construction necessary to complete the proposed modifications and complete construction within 30 days of the plans' approval, the Board would forego filing a lawsuit.

On March 20, 2006, Lee responded that the Uptegraphs, without the waiver of any rights, had agreed to move the Sandalwood Drive fence if the Board approved the fifth set of plans. Lee's letter specifically reserved the Uptegraphs' rights to seek any remedies, including filing suit, to reinstall the Sandalwood Drive fence in the current location and to seek the costs of removing and replacing the fence, along with the cost of the substitute fencing depicted on the fifth set of plans.

Reynolds replied to Lee on March 24, 2006, informing him that, while the fence on the Sandalwood Drive side of the lot appeared to be properly located with regard to the 25–foot setback line, the proposed plans did not specify the height of the fence or the materials to be used. The ACC was also concerned that the driveway depicted in the fifth set of plans was an old configuration that had already been changed with approval from the ACC. Therefore, a formal submission of plans addressing these issues would need to be submitted. Reynolds also relayed a proposed settlement from the Board with a mutual release of claims, offering to waive claims for costs, attorney's fees, and statutory damages, and setting the deadline for resolution on March 29, 2006.

On March 29, 2006, Lee forwarded a sixth set of plans to the Board. The plans depicted a six-foot-high-wrought-iron fence set 25 feet back from Sandalwood Drive and a new 10–foot–high wood fence running along the front of the property set 10 feet back from Beechmont Road. In an accompanying letter, Lee stated that the Uptegraphs declined the Board's settlement offer and reiterated that his clients would remove the "allegedly offending fence" if the new plans were approved, but would not release their right to seek any available remedies, including filing suit to reinstall the fence in its current location. Lee tendered a counteroffer from the Uptegraphs to re-route portions of the existing fence.

Reynolds replied in an email that if an agreement was not reached by March 31, 2006, the Board would file suit on Monday, April 3, 2006. The Uptegraphs then removed some of the wrought iron panels and replaced them with temporary orange webbing, but, through an email from Lee, reserved their right to seek available remedies.

Reynolds sent a letter to Lee on April 6, 2006, informing him that the ACC had met and approved the proposed new fence facing Sandalwood Drive, as depicted in the sixth set of plans, but did not approve the proposed fence facing Beechmont Road.[3] The letter also stated that every portion of the already constructed fence that was closer to the street than the setback line had to be removed before Sunday, April 9, 2006, and a mutual release agreed upon and entered by that date, or suit would be filed on Monday, April 10, 2006.

Portions of the fence that were closer to the street than the setback line were not removed by April 9, 2006, and Sandalwood CC filed suit against the Uptegraphs on April 10, 2006, seeking injunctive relief to enforce its restrictive covenants, a declaratory judgment affirming its authority to enforce the restrictive covenants, damages pursuant to section 202.004(c) of the Texas

---

3. Reynolds testified at trial that the ACC did not have the authority to approve a 10–foot high fence; a fence of that height required approval from the City of Houston.

Property Code, costs, attorney's fees, and pre- and post-judgment interest. The Uptegraphs responded with a general denial and affirmative defenses and also raised counterclaims seeking a declaratory judgment that their fence did not violate the deed restrictions or, alternatively, that Sandalwood CC had been arbitrary, capricious, or discriminatory in not granting the Uptegraphs a "variance," and damages for breach of contract, costs, and attorney's fees.

After a two-day bench trial, the trial court signed a final judgment in favor of Sandalwood CC, granting Sandalwood CC its requested injunctive and declaratory relief, $20,000 in damages pursuant to Texas Property Code 202.004, $75,000 in attorney's fees, additional attorney's fees if the case was appealed, costs, and pre- and post-judgment interest. The trial court denied the Uptegraphs' counterclaim and ordered that they take nothing on it.

### Interpretation of the Restrictive Covenant

In their first issue, the Uptegraphs contend that the trial court erroneously interpreted provisions of the restrictive covenant regarding the minimum distances at which fences must be placed from Sandalwood Drive. The Uptegraphs challenge the trial court's finding of fact number 7 that "[t]he minimum setback line on Defendants' property along Sandalwood Drive is 25 feet." We construe the Uptegraphs' first issue to be a challenge to the trial court's interpretation of the restrictive covenant as a matter of law. *See* TEX.R.APP. P. 38.1(f), 38.9; *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989).

#### A. Rules governing the construction of restrictive covenants

##### 1. Standard of review

■ The subdivision's deed restrictions are restrictive covenants concerning real property. *See* TEX. PROP.CODE ANN. § 202.001(4) (Vernon 2007) (defining restrictive covenant). Restrictive covenants are subject to the general rules of contract construction. *Pilarcik v. Emmons*, 966 S.W.2d 474, 478 (Tex.1998); *Bank United v. Greenway Improvement Ass'n*, 6 S.W.3d 705, 707 (Tex.App.-Houston [1st Dist.] 1999, pet. denied). As when interpreting any contract, the court's primary duty in construing a restrictive covenant is to ascertain the drafter's intent from the instrument's language. *Bank United*, 6 S.W.3d at 708. In ascertaining the drafter's intent, we must examine the covenant as a whole in light of the circumstances present when the covenant was made. *Pilarcik*, 966 S.W.2d at 478. We must give a restrictive covenant's words and phrases their commonly accepted meaning. *Truong v. City of Houston*, 99 S.W.3d 204, 214 (Tex.App.-Houston [1st Dist.] 2002, no pet.). We review a trial court's interpretation of a restrictive covenant de novo. *Air Park–Dallas Zoning Committee v. Crow–Billingsley Airpark, Ltd.*, 109 S.W.3d 900, 909 (Tex.App.-Dallas 2003, no pet.).

■ Whether restrictive covenants are ambiguous is a matter of law for the court to decide. *Pilarcik*, 966 S.W.2d at 478; *Samms v. Autumn Run Cmty. Improvement Ass'n, Inc.*, 23 S.W.3d 398, 402 (Tex.App.-Houston [1st Dist.] 2000, pet. denied). A covenant is unambiguous if, after appropriate rules of construction have been applied, the covenant can be given a definite or certain legal meaning. *Pilarcik*, 966 S.W.2d at 478; *Pitman v. Lightfoot*, 937 S.W.2d 496, 517 (Tex.App.-San Antonio 1996, writ denied) (holding same concerning contracts generally). In contrast, if, after appropriate rules of construction have been applied, a covenant is susceptible of more than one reasonable

interpretation, the covenant is ambiguous. *Pilarcik*, 966 S.W.2d at 478; *Universal C.I.T. Credit Corp. v. Daniel*, 150 Tex. 513, 243 S.W.2d 154, 157 (1951). Mere disagreement over a restrictive covenant's interpretation does not necessarily render the covenant ambiguous. *Air Park–Dallas Zoning Comm.*, 109 S.W.3d at 909.

## 2. Common law versus section 202.003(a)

At common law, covenants restricting the free use of land are not favored but will still be enforced when they are confined to a lawful purpose and are clearly worded. *E.g., Wilmoth v. Wilcox*, 734 S.W.2d 656, 657 (Tex.1987). Accordingly, under the common law, a restrictive covenant's words cannot be enlarged, extended, stretched, or changed by construction. *Id.* All doubts concerning a restrictive covenant's terms are resolved in favor of the free and unrestricted use of the land, and any ambiguity must be strictly construed against the party seeking to enforce the covenant. *Id.*

In 1987, the Legislature amended the Texas Property Code to provide that all restrictive covenants contained in instruments governing certain residential developments, regardless of the date on which the covenants were created, must be liberally construed to give effect to their purposes and intent. *See* Act of May 23, 1987, 70th Leg., R.S., ch. 712, § 1, 1987 Tex. Gen. Laws 2585, 2585 (current version at Tex. Prop.Code Ann. §§ 202.002(a), 202.003(a) (Vernon 2007)).

## 3. Split among the courts

Some courts of appeals have recognized that the common-law requirement of construing restrictions strictly and section 202.003(a)'s requirement of construing residential covenants liberally to effectuate their purposes and intent might appear contradictory.[4] As a result, some courts of appeals have held or implied that section 202.003(a)'s liberal-construction rule concerning residential covenants supersedes the common-law rule of strict construction.[5] In contrast, other courts of appeals, including ours, have concluded that there is no discernable conflict between the common law and section 202.003(a).[6] Even

---

**4.** *See Dyegard Land P'ship v. Hoover*, 39 S.W.3d 300, 309 (Tex.App.-Fort Worth 2001, no pet.); *see also Herbert v. Polly Ranch Homeowners Ass'n*, 943 S.W.2d 906, 908 n. 2 (Tex.App.-Houston [1st Dist.] 1996, no writ) ("Even after the enactment of section 202.003, this Court stated that covenants restricting the free use of land were not favored. It is not necessary for us to resolve such discrepancies today because under either approach we would reach the same result....").

**5.** *See Village of Pheasant Run Homeowners Ass'n, Inc. v. Kastor*, 47 S.W.3d 747, 750–51 (Tex.App.-Houston [14th Dist.] 2001, pet. denied); *Benard v. Humble*, 990 S.W.2d 929, 930–31 (Tex.App.-Beaumont 1999, pet. denied); *Candlelight Hills Civic Ass'n v. Goodwin*, 763 S.W.2d 474, 476, 477, 480 (Tex. App.-Houston [14th Dist.] 1988, writ denied); *see also Highlands Mgt. Co. v. First Interstate Bank of Tex., N.A.*, 956 S.W.2d 749, 752 (Tex. App.-Houston [14th Dist.] 1997, pet. denied)

(citing holding of *Goodwin*, but noting that *Highlands* court did not disagree with *Wilmoth's* statement of the strict-construction rule); *Herbert v. Polly Ranch Homeowners Ass'n*, 943 S.W.2d 906, 913 (Tex.App.-Houston [1st Dist.] 1996, no writ) (Wilson, J., dissenting on denial of rehearing).

**6.** *See Reagan Nat'l Advertising of Austin, Inc. v. Capital Outdoors, Inc.*, 96 S.W.3d 490, 493 n. 2 (Tex.App.-Austin 2002, pet. granted, judgm't vacated w.r.m.); *Dyegard*, 39 S.W.3d at 309; *Simon Prop. Gr. (Tex.) L.P. v. May Dep't Stores Co.*, 943 S.W.2d 64, 71 (Tex.App.-Corpus Christi 1997, no writ); *Ashcreek Homeowner's Ass'n v. Smith*, 902 S.W.2d 586, 588–89 (Tex.App.-Houston [1st Dist.] 1995, no writ); *Crispin v. Paragon Homes, Inc.*, 888 S.W.2d 78, 81 & 81 n. 1 (Tex.App.-Houston [1st Dist.] 1994, writ denied); *see also Highlands Mgt. Co.*, 956 S.W.2d at 752 (citing section 202.003(a)'s liberal-construction rule, but then noting that *Highlands* court did not

among the courts that believe that the common law and section 202.003(a) can be reconciled, there exists a split in how to apply section 202.003(a). Some of these courts, including ours, have simply continued to apply the common-law rule without a precise explanation of how to reconcile it with section 202.003(a).[7] Other courts of appeals have held that the common-law rule applies only when there is an ambiguity concerning the drafter's intent, but to determine if such an ambiguity exists, these courts first apply section 202.003(a)'s liberal-construction mandate.[8]

Finally, we note that some courts of appeals since 1987 have simply continued applying the common-law strict-construction rule without referring to section 202.003(a) at all.[9] Others, including ours, have applied section 202.003(a)'s liberal-construction standard without referring to the common-law construction principles at all.[10]

The Texas Supreme Court has noted, but not yet resolved, the potential conflict between the common law and section 202.003(a). *See Pilarcik*, 966 S.W.2d at 478; *see also Herbert*, 943 S.W.2d at 908 n. 2 (noting that supreme court's opinion in *Wilmoth*—which relied on common-law re-strictive-covenant-construction rules and not on section 202.003(a)—issued soon after section 202.003(a)'s effective date, but that issue of whether section 202.003(a) changed the common-law construction

---

disagree with *Wilmoth's* statement of the strict-construction rule).

7. *See Reagan Nat'l Advertising*, 96 S.W.3d at 493 & 493 n. 2; *Dyegard*, 39 S.W.3d at 309; *Simon Prop. Gr.*, 943 S.W.2d at 71; *Crispin*, 888 S.W.2d at 81.

8. *See Quinn v. Harris*, No. 03–98–00117–CV, 1999 WL 125470 at *2 n. 3 (Tex.App.-Austin Mar. 11, 1999, pet. denied) (not designated for publication) ("The Fourth Court of Appeals has employed both [section 202.003(a)'s liberal and the common law's strict] standards to review a restrictive covenant, finding that the covenant should be liberally construed to determine the framers' intent, and if there is any ambiguity as to that intent, the covenant should then be strictly construed in favor of the free and unrestricted use of the premises.... We believe the Fourth Court of Appeals has found the proper balance between the two standards that does not conflict with precedent or the Texas Property Code.") (citation omitted); *see also Pitman v. Lightfoot*, 937 S.W.2d 496, 517 (Tex.App.-San Antonio 1996, writ denied) (holding that contract is unambiguous as matter of law if, after appropriate rules of construction have been applied, it can be given definite or certain legal meaning).

9. *See Pebble Beach Prop. Owners' Ass'n v. Sherer*, 2 S.W.3d 283, 288 (Tex.App.-San Antonio 1999, pet. denied)

10. *See Truong v. City of Houston*, 99 S.W.3d 204, 214 (Tex.App.-Houston [1st Dist.] 2002, no pet.); *Am. Golf Corp. v. Colburn*, 65 S.W.3d 277, 280 (Tex.App.-Houston [14th Dist.] 2001, pet. denied); *Samms v. Autumn Run Community Improvement Ass'n, Inc.*, 23 S.W.3d 398, 402 (Tex.App.-Houston [1st Dist.] 2000, pet. denied); *Bank United v. Greenway Improvement Ass'n*, 6 S.W.3d 705, 708 (Tex. App.-Houston [1st Dist.] 1999, pet. denied); *Boudreaux Civic Ass'n v. Cox*, 882 S.W.2d 543, 547 (Tex.App.-Houston [1st Dist.] 1994, no writ); *Gettysburg Homeowners Ass'n v. Olson*, 768 S.W.2d 369, 372 (Tex.App.-Houston [14th Dist.] 1989, no writ); *see also Herbert*, 943 S.W.2d at 907–08 & 908 n. 2 (citing 202.003(a)'s construction standard and declining to resolve any conflict between that section's construction standard and that of common law). Still other courts have referred to both standards together without discussing whether the standards do or do not conflict. *See Air Park–Dallas Zoning Comm. v. Crow–Billingsley Airpark, Ltd.*, 109 S.W.3d 900, 909 (Tex.App.-Dallas 2003, no pet.); *see also Hodas v. Scenic Oaks Prop. Ass'n*, 21 S.W.3d 524, 528 (Tex.App.-San Antonio 2000, pet. denied) (noting that section 202.003(a)'s construction standard applies to determine intent and that strict-construction rule applies if covenant ambiguous).

rules was not raised or briefed in *Wilmoth* ).

### 4. This Court's approach

In this case, neither party asserts that the covenant is ambiguous. The trial court found that the covenant is unambiguous, and we agree. Because the covenant is unambiguous, our interpretation of the Sandalwood covenant is the same under both the common law and section 202.003(a). Because the Supreme Court has not yet spoken on the issue, and because the outcome of this case does not rely on our resolving any ambiguity between the common law and section 202.003(a), it is unnecessary for us to address that question.

### B. Sandalwood covenants

The following sections from article II of Sandalwood subdivision's restrictive covenants apply to the Uptegraphs' fence:

2.  No building, structure, fence, wall or other improvement shall be erected, placed or altered on any lot or lots until the construction plans, specifications and design and a plan showing the location of the structure on the lot or lots have been approved by a majority of the [ACC], including approval as to quality of workmanship and materials, harmony of external design with existing structures, and as to location with respect to topography and finish grade of elevation.

[ . . . . ]

9.  No fence or wall shall be erected, altered, placed or permitted to remain on any lot nearer to the street than the minimum building setback line unless approved by the [ACC]. . . .

The primary disagreement between the Uptegraphs and Sandalwood CC is the meaning of the term "minimum building setback line" in section 9. The Uptegraphs assert that the plain meaning of this phrase is the least of all setback lines applicable to a property. In support of their position, the Uptegraphs compare the language in section 9 with the language in sections 7, 8, and 14:

7.  No residence or building of any kind shall be located on any lot nearer to the front lot line or nearer to the side street line than the building setback lines shown on the appropriate recorded plat. . . .

8.  In addition to meeting the requirements of the building setback lines, as shown on the appropriate recorded plat, no building, except a detached garage, out-building or guest or servants quarters located 65 feet or more from the front lot line shall be erected, placed or altered on any lot nearer than five feet from any side lot line. No detached garage, out-building or guest or servants quarters, including their roofs and gutters, that is located 65 feet or more from the front lot line shall be erected, placed or altered on any lot nearer than three feet from any side lot line.

[ . . . . ]

14. In addition to meeting the requirements of the building setback lines as shown on the appropriate recorded plat, and the existing setbacks contained in the Deed Restrictions, and notwithstanding anything else contained in the Deed Restrictions to the contrary, no first floor of any building, including the roof and gutter shall be located nearer to the rear lot line than ten feet (10′), and no building, including the roof and gutter, shall be located nearer to a side lot line

than five feet (5').... If there is a disagreement with the [ACC] concerning the determination of side and/or rear setbacks, then appeal may be made to the Board of Directors of Sandalwood Civic Club, Inc. ("Board of Directors") for determination. Unless the Board of Directors votes unanimously to override the [ACC], the determination of the [ACC] shall be final....

The Uptegraphs note that phrase "minimum building setback line" appears in section 9, but does not appear anywhere else in the restrictive covenants. They also note that, while the phrase "shown on the appropriate recorded plat" is included in several other sections, it does not appear in section 9. Therefore, the Uptegraphs argue, the term "minimum building setback line" refers to the minimum possible distance that any structure may be built from any lot line on the property, and assert that that distance is five feet—the minimum distance that a building must be located from the side lot line according to section 14, and reflected on the recorded plat as a utility easement. The Uptegraphs assert that since section 9 does not specifically reference the recorded plat, the term "building setback line" in section 9 refers to not only the building setback lines found on the recorded plat but also any setbacks in the Sandalwood deed restrictions. They then argue that section 14 of Sandalwood's deed restrictions contains a five-foot building setback line applicable to their property and this is the "minimum building setback line" referenced in section 9.

■ This interpretation lacks merit. We first note that the five-foot setback in section 14 specifically applies to a setback

from the "side lot line," while section 9 deals exclusively with the distance "from the street" that a fence or wall may be built, as established by the "minimum building setback line." Thus, the "side lot line" setback established by the deed restrictions in section 14 cannot be the "minimum building setback line" from "the street" that a fence or structure must be located as required by section 9. Additionally, section 14 does not refer to setbacks contained in the deed restrictions as "building setback lines." Rather, it states, "[i]n addition to meeting the requirements of the *building setback lines* as shown on the appropriate recorded plat, and the existing *setbacks* contained in the Deed Restrictions...." (emphasis added). While the deed restrictions almost always refer to "building setback lines" as those "shown on the appropriate recorded plat," the deed restrictions never refer to "building setback lines" as those "contained in the Deed Restrictions." The deed restrictions simply call those "setbacks."

The most obvious explanation for the difference in terminology is that it reflects the difference between the minimum building setback lines established by the City of Houston, which are recorded on the properties' plats, and the setbacks established by the deed restrictions.[11] Minimum building setback lines are established by government authorities, such as the City of Houston, in order to mandate a minimum distance that structures must be set back relative to a city street or for the purposes of an easement. *See* Tex. Loc. Gov't Code Ann. §§ 214.132–33 (Vernon 2008) (permitting governing body of municipality to establish building line on street and prohibiting erection, re-erection, reconstruction, or substantial repair of structure in area be-

11. We note also that the deed restrictions contain words, not pictures. While the deed restrictions contain setback distances, they do not contain setback *lines*. The recorded plats, however, are pictorial, so they do contain actual building setback lines.

tween street and building line); *see also* HOUSTON, TEX., CODE OF ORDINANCES, ch. 42, art. III, § 42–150 (August 21, 1985) (setting minimum building line requirements and prohibiting construction therein). In the City of Houston, these building setback lines are required to be reflected on subdivision and development plats, so the phrase "shown on the appropriate recorded plat" is implied when one discusses a building setback line. *See id.* In the Code of Ordinances for the City of Houston, this minimum distance is termed the "*minimum* building line" (emphasis added), and deed restrictions may provide for "a greater building line or setback," but not one that is less than the minimum standard required by the city. *See id.* ch. 42, art. III, §§ 42–150, 42–152–42–161. Construction of improvements requiring building permits within the "minimum building line" is prohibited. *Id.* ch. 42, art. III, § 42–150. Additionally, a person who fails to comply with the minimum setback building lines set out on a recorded plat may be subject to civil penalties for violating a City ordinance of up to $1000 per day which may be prosecuted by the city attorney either as a suit to enforce a restriction or as an intervenor in a restriction suit. *See id.* ch. 10, art. XV, §§ 10–551–53; *see also* TEX. LOC. GOV'T CODE ANN. §§ 212.151–53, –156; –150 (Vernon 2008).

The Uptegraphs assert that because sections of the restrictive covenants other than section 9 do not use the word "minimum," a "minimum building setback line" must be different than a "building setback line[ ] shown on the appropriate recorded plat." The Uptegraphs adopt the following definition of "minimum": "the lowest value in a set of more than one option."

Using this definition, the Uptegraphs explain, "In Sandalwood, any one side of a property will have no more than one setback line, but there are multiple setback lines for the property as a whole. Thus, the term 'minimum' has a readily ascertainable meaning when considered in light of the multiple setbacks applicable to a lot—it means the smallest setback line for the property."

We disagree. This definition would ignore the existence and controlling authority of the City of Houston's ordinances providing for required specific "minimum building [setback] lines" for improvements on a property relative to particular streets and easements. Moreover, the "minimum" descriptor applied to "building setback lines" in section 9 clearly is meant to reference the "minimum building lines" required by the City of Houston relative to streets. The plain meaning of "minimum building setback line" in the context of a street is the minimum distance that a structure may be built from a particular street.[12] That is, if the minimum building setback line relative to the street on the front of a lot is 25 feet, and that setback line applies to fences, the owner may build a fence 26 feet from the street but not 24 feet; 25 feet is the absolute minimum distance that the fence must be built from the street.

We conclude that the restrictive covenants in this case are not ambiguous. Although the parties differ over the interpretation of the restrictions, they can be given a definite and certain legal meaning. *Air Park–Dallas Zoning Comm.*, 109 S.W.3d at 909. We hold that the term "minimum building setback lines" in section 9 of the

---

**12.** Other courts have operated under a similar understanding of this term. *See City of Austin v. Hyde Park Baptist Church*, 152 S.W.3d 162, 167 (Tex.App.-Austin 2004, no pet.); *Texans to Save Capitol, Inc. v. Board of Adjustment of the City of Austin*, 647 S.W.2d 773, 776 (Tex.App.-Austin 1983, writ ref'd n.r.e.); *Martin v. Moore*, 562 S.W.2d 274, 277, 279 (Tex.Civ.App.-Austin 1978, no writ.).

Sandalwood deed restrictions means the setback lines depicted on the recorded property plats that reflect the minimum building lines from particular streets established by the City of Houston. Section 9 thus simply ensures that a fence or wall will not be built nearer to a street than the minimum distance required by the applicable City of Houston's building setback ordinance, by prohibiting it from being nearer the street than the "minimum building setback line" reflected on the recorded plat.[13] The evidence at trial established that the minimum building setback line for the Uptegraphs' property along Sandalwood Drive was 25 feet. Accordingly, the trial court did not err in so finding.

We overrule the Uptegraphs' first issue.

## Sufficiency of Evidence Regarding Presumption

In their second amended answer to Sandalwood CC's petition, the Uptegraphs contended that Sandalwood CC's rejection of the Sandalwood Drive fence was arbitrary and capricious because, they contended, the Uptegraphs' change in the orientation of the house to face Beechmont Road changed the setback line along Sandalwood Drive. Alternatively, the Uptegraphs contended that Sandalwood CC was arbitrary and capricious in refusing to permit the construction of fences closer to the street than the setback line.

The Uptegraphs also countersued Sandalwood CC:

(1) asserting that Sandalwood CC's insistence that the Sandalwood Drive fence be removed was wrongful and seeking damages against Sandalwood CC for the cost of removing the fence, erecting a temporary barrier, and future costs of re-erecting the fence;

(2) asserting that Sandalwood CC breached a contract—the deed restrictions—by attempting to enforce them in an arbitrary and capricious manner and seeking recovery of attorney's fees; and

(3) seeking a declaratory judgment that the Sandalwood Drive fence was not subject to a setback line at all or was governed by a 10-foot setback line, alternatively asserting that Sandalwood CC's refusal to grant them a "variance" for the Sandalwood Drive fence was "arbitrary, capricious, and/or discriminatory," and requesting the award of attorney's fees.

The trial court entered various findings of fact and conclusions of law that Sandalwood CC's decisions and actions were reasonable and not arbitrary, capricious, or discriminatory. It also entered conclusions of law that the Uptegraphs were not entitled to any relief or the recovery of any damages and denied the Uptegraphs any relief or damages in its judgment.

In their second issue on appeal, the Uptegraphs assert that "there is no evidence to support the trial court's findings and conclusions [14] that Sandalwood CC act-

13. Section 9 also provides that the ACC may approve a fence or wall closer to the street than the minimum building setback distance. That portion of section 9, if exercised, would appear to place the homeowner in violation of the applicable City minimum building line ordinance, notwithstanding any approval on the part of the ACC, when the fence or wall is one which requires a building permit. *See* HOUSTON, TEX., CODE OF ORDINANCES, ch. 42, art. III, § 42–150 (1985) (prohibiting construction of improvement requiring building permit within minimum building line requirement established by article).

14. The Uptegraphs cite to the following findings of facts:

    35. The decisions and actions of Plaintiff in rejecting the plans for the fence along Sandalwood Drive and along Beechmont, and Plaintiff's interpreta-

ed reasonably in denying the Uptegraphs' fence," alternatively argue that the trial court's findings are against the great weight and preponderance of the evidence, and, assert that, consequently, the trial court's conclusions of law are erroneous as a matter of law. The Uptegraphs also request this Court to render judgment in their favor.

However, the Uptegraphs do not challenge the trial court's conclusions of law numbers 24 and 25 providing that the Uptegraphs are not entitled to recover any damages and are not entitled to any relief, nor do they complain on appeal of the portion of the trial court's judgment denying their counterclaim against Sandalwood CC. Accordingly, we construe the Uptegraphs' arguments under this issue as a challenge to the complained-of findings of fact and conclusions of law only as they pertain to the Uptegraphs' defenses to Sandalwood CC's attempts to enforce the restrictive covenants.

The Uptegraphs argue that the evidence at trial showed that Sandalwood CC acted arbitrarily, capriciously, and in a discriminatory manner by denying the Uptegraphs' plans for the Sandalwood Drive fence and by "rejecting the authority" it had to grant an exception under section 9 by deciding that it would not grant such an exception without a "compelling reason," even though the deed restrictions did not set out any particular standard for determining when to allow exceptions. Though not clearly set out, the Uptegraphs also appear to challenge the sufficiency of the evidence to support the trial court's findings and conclusions that Sandalwood CC did not waive the right to enforce its restrictive covenants.

## A. Texas Property Code section 202.004(a)

Section 202.004(a) of the Texas Property Code creates a presumption that a property owners' association or other representative exercises its discretionary authority concerning a restrictive covenant reasonably "unless the court determines

tion of its restrictive covenants, were reasonable and were not arbitrary, capricious, or discriminatory.

36. No compelling reason was shown to require Plaintiff to allow the said fence to be built closer to the street along Sandalwood Drive than the 25 foot setback line.

37. There was no showing of any knowing, voluntary, intentional approval or acquiescence in any other fence within any section of Sandalwood being built or maintained closer to the street than the applicable setback line.

38. Plaintiff did not know of any other fences within Sandalwood being closer to the street than the setback line prior to the filing of this suit.

39. Only two other fences within Sandalwood, out of approximately 180 lots, were shown to be closer to the street than the setback line. This does not amount to a sufficient number of violations to constitute waiver or abandonment of the restrictive covenants.

and conclusions of law:

7. The actions of the ACC and Plaintiff in rejecting the plans for the fence along Sandalwood Drive as constructed, and Plaintiff's interpretation of its restrictive covenants, are presumed reasonable under Texas Property Code 202.004, and are found to have been reasonable, and were not arbitrary, capricious, or discriminatory.

8. The actions of the ACC and Plaintiff in rejecting the plans for the Beechmont fence, and Plaintiff's interpretation of its restrictive covenants, are presumed reasonable under Texas Prop.Code § 202.004, and are found to have been reasonable, and were not arbitrary, capricious, or discriminatory.

9. Plaintiff has not waived nor abandoned the restrictive covenants.

10. Plaintiff has been diligent in enforcing its restrictive covenants.

13. Plaintiff is not barred from bringing this action by any theory of estoppel.

by a preponderance of the evidence that the exercise of discretionary authority was arbitrary, capricious, or discriminatory." Tex. Prop.Code Ann. § 202.004(a) (Vernon 2007). A presumption is simply a rule of procedure or an administrative assumption that may be overcome when positive evidence to the contrary is introduced. *Green v. Ransor, Inc.*, 175 S.W.3d 513, 516 (Tex.App.-Fort Worth 2005, no pet.). Therefore a showing, by a preponderance of the evidence, that the property owner's association exercised its discretionary authority concerning a restrictive covenant in a way that was arbitrary, capricious, or discriminatory merely destroys the presumption that the association acted reasonably. *See* Tex. Prop.Code Ann. § 202.004(a).

## B. Standard of review

▆▆ Because Sandalwood CC was entitled to a presumption under section 202.004(a) that its exercise of its discretionary authority concerning the deed restrictions was reasonable, it was the Uptegraphs' burden at trial to prove that Sandalwood CC's exercise of its discretionary authority was arbitrary, capricious, or discriminatory. *See id.*

We review sufficiency challenges to findings of fact under the same standards that we use in reviewing the legal or factual sufficiency of the evidence supporting jury findings. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex.1994).

"When a party attacks the legal sufficiency of an adverse finding on an issue on which she has the burden of proof, she must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue." *Dow Chemical Co. v. Francis*, 46 S.W.3d 237, 241 (Tex.2001) (citing *Sterner*, 767 S.W.2d at 690). In reviewing the legal sufficiency of the trial court's finding, we must "exam-

ine the record for evidence that supports the finding, while ignoring all evidence to the contrary." *Id.* If there is no evidence supporting the finding of the trial court, then we must "examine the entire record to determine if the contrary proposition is established as a matter of law." *Id.* We will sustain the legal sufficiency challenge "only if the contrary proposition is conclusively established." *Id.* (citing *Croucher v. Croucher,* 660 S.W.2d 55, 58 (Tex.1983)).

"When a party attacks the factual sufficiency of an adverse finding on an issue on which she has the burden of proof, she must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence." *Id.* at 242. We must "consider and weigh all of the evidence," and we "can set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Id.*

We review a trial court's conclusions of law under a de novo standard. *BMC Software Belg. v. Marchand,* 83 S.W.3d 789, 794 (Tex.2002). An appellant may not challenge a trial court's conclusion of law for factual insufficiency, but the reviewing court may review the trial court's legal conclusions drawn from the facts to determine their correctness. *Id.* We will uphold a trial court's conclusion of law on appeal if the judgment can be sustained on any legal theory supported by the evidence. *Keith v. Keith,* 221 S.W.3d 156, 167–68 (Tex.App.-Houston [1st Dist.] 2006, no pet.); *see also Marchand,* 83 S.W.3d at 794 (holding that if reviewing court determines conclusion of law erroneous, but trial court rendered proper judgment, erroneous conclusion does not require reversal). "An incorrect finding of fact or conclusion of law does not warrant a reversal if the judgment is otherwise correct." *Loera v. Interstate Invest.*

*Corp.*, 93 S.W.3d 224, 229 (Tex.App.-Houston [14th Dist.] 2002, pet. denied); *Vaughn v. DAP Financial Servs.*, 982 S.W.2d 1, 6 (Tex.App.-Houston [1st Dist.] 1997, no pet.).

## C. Denial of plans to build Sandalwood Drive fence

To the extent that the Uptegraphs challenge the trial court's findings of fact and conclusions of law that Sandalwood CC acted reasonably in rejecting the Uptegraph's plans to build a fence[15] closer than 25 feet to Sandalwood Drive and that Sandalwood CC properly construed the deed restrictions to prohibit a fence closer than 25 feet to Sandalwood Drive (finding of fact number 35 and conclusion of law number 7), we overrule this contention. As we have already held, 25 feet was the minimum setback line under the deed restrictions applicable to the fence on Sandalwood Drive. The evidence at trial supports the trial court's findings and conclusions that Sandalwood CC properly construed the deed restrictions to require a 25–foot setback from Sandalwood Drive and acted reasonably in rejecting plans for a fence to be constructed in violation of the deed restrictions. Accordingly, the Uptegraphs have not met their burden to establish, as a matter of law, all vital facts in support of the issue, nor have they shown that this adverse finding is against the great weight and preponderance of the evidence. The Uptegraphs also failed to meet their burden of proof to show that Sandalwood CC's exercise of its discretionary authority in construing the deed restrictions to require a 25–foot setback from Sandalwood Drive and rejecting the Uptegraphs plans for a fence less than 25 feet from Sandalwood Drive was arbitrary, capricious, or discriminatory. We overrule the Uptegraphs' challenges to the trial court's findings of fact number 35 and conclusion of law number 7.

## D. Denial of an exception and waiver

To the extent that the Uptegraphs challenge the trial court's findings and conclusions regarding Sandalwood CC's decision not to grant the Uptegraphs an exception to the deed restrictions that would permit them to build a fence less than 25 feet from Sandalwood Drive, we likewise find that the Uptegraphs did not meet their burden to establish, as a matter of law, all vital facts in support of this issue, nor have they shown that this adverse finding is against the great weight and preponderance of the evidence. The Uptegraphs also did not meet their burden to prove that Sandalwood CC's exercise of its discretionary authority in declining to grant the Uptegraphs an exception to the deed restrictions was arbitrary, capricious, or discriminatory. It was not arbitrary,

15. In this issue, the Uptegraphs make repeated references to "the Uptegraphs' fence" but do not specify whether they are referring to the Sandalwood Drive fence or the Beechmont Road fence. One of the findings and conclusions that they challenge refers to both fences and one (conclusion of law number 8) only references the Beechmont Road fence. Based on our reading of the Uptegraphs' issue and the setback lines and claims regarding waiver discussed, we conclude that the Uptegraphs are only challenging the trial court's findings and conclusions applicable to Sandalwood CC's actions relative to the Sandalwood Drive fence. We discern no argument pertaining to the rejection of the plans for the Beechmont Road fence and so deem any attempted challenge to conclusion of law 8 to be inadequately briefed and do not address it. *See* Tex.R.App. P. 38.1(i); *Howeth Inves., Inc. v. City of Hedwig Vill.*, 259 S.W.3d 877, 902 (Tex.App.-Houston [1st Dist.] 2008, pet. denied). We note, however, that Sandalwood CC presented evidence at trial that plans for the proposed 10–foot high Beechmont fence were rejected because only the City could authorize the building of a fence of that height.

capricious, or discriminatory for Sandalwood CC to adopt standards for deciding whether to grant a request for an exception under section 9 and the adoption of a "compelling reason" standard is not arbitrary, capricious, or discriminatory. The fact that two other houses in the subdivision had fences closer to a street than the minimum setback line does not establish that Sandalwood CC's decision to deny the Uptegraphs's request was arbitrary, capricious, or discriminatory.

Nor does it establish waiver on the part of Sandalwood CC. When lot owners acquiesce in substantial violations within a restricted area, said acquiescence can amount to an abandonment of the covenant or a waiver of the right to enforce it. *Cowling v. Colligan*, 158 Tex. 458, 312 S.W.2d 943, 945 (1958). To establish abandonment, a party must prove that the violations are so great as to lead the mind of the average man to reasonably conclude that the restriction in question has been abandoned. *Id.* at 945–46. In making this determination, we consider " 'the number, nature, and severity of the then existing violations, any prior acts of enforcement of the restriction, and whether it is still possible to realize to a substantial degree the benefits intended through the covenant.' " *Tanglewood Homes Assoc., Inc. v. Henke*, 728 S.W.2d 39, 43–44 (Tex.App.-Houston [1st Dist.] 1987, writ ref'd n.r.e.) (quoting *New Jerusalem Baptist Church, Inc. v. City of Houston*, 598 S.W.2d 666, 669 (Tex. Civ.App.-Houston [14th Dist.] 1980, no writ.)).

At trial, the Uptegraphs presented evidence that two other homes had fences that violated the Sandalwood deed restrictions by being closer to a street the building setback lines. Sandalwood CC presented the testimony of Robert Schick, a Sandalwood subdivision resident since 1994 and president of Sandalwood CC at the time of the trial, and Phillip Ewald, a Sandalwood subdivision resident since 1989 and member of the ACC since approximately 1991. Schick and Ewald testified that the Schroeder fence was closer to the street than the applicable setback line. However, testimony also established that the fence was built prior to 1989, so as a pre-existing violation, the fence was grandfathered by the 1990 deed restrictions. Testimony also established that the ACC could not have shown favoritism to Mr. Schroeder, a member of the ACC at the time of the trial, because the Schroeder fence existed decades before Schroeder acquired the property. The ACC did not become aware that the Schroeder fence was built outside the applicable setback line until a month before trial.

The second violation, the Marsh fence, was also grandfathered by the 1990 deed restrictions. Schick and Ewald explained that the ACC approved the addition of an ornamental gate and a small length of fence to connect the grandfathered fence to the Marsh garage. Though the gate and additional fence were built closer to the street than applicable setback lines, the ACC approved the addition so that Mr. Marsh could enclose his property for security purposes. Marsh was a member of the Board at the time of this addition, but testimony demonstrated that Marsh was not shown favoritism by the ACC, which rejected Marsh's original plans and required amendments before approval.

Additionally, two setback violations in a subdivision containing approximately 180 houses is insufficient to establish abandonment, even if the two offending fences had not been grandfathered. If the two fences were actual violations and not grandfathered violations, the Sandalwood subdivision violation rate would be approximately 1.11%. "Texas courts have found that violation rates ranging from 1.9% to 8.9%

were not sufficient to support waiver and abandonment...." *City of Houston v. Revels,* No. 14–99–00139–CV, 2001 WL 699546, at *2 (Tex.App.-Houston [14th Dist.] June 21, 2001, pet. denied) (not designated for publication); *see also Sherer,* 2 S.W.3d at 290–91; *Dempsey v. Apache Shores Prop. Owners Ass'n,* 737 S.W.2d 589, 595 (Tex.App.-Austin 1987, no writ); *Henke,* 728 S.W.2d at 44; *New Jerusalem Baptist Church,* 598 S.W.2d at 669; *Underwood v. Webb,* 544 S.W.2d 187, 190 (Tex.Civ.App.-Waco 1976, writ ref'd n.r.e.); *Garden Oaks Bd. of Tr. v. Gibbs,* 489 S.W.2d 133, 134 (Tex.Civ.App.-Houston [1st Dist.] 1972, writ ref'd n.r.e.).

We conclude that the Uptegraphs have not meet the burdens applicable to their challenges of the trial court's findings of fact and conclusions of law. We overrule their challenges to findings of fact numbers 36, 37, 38, and 39 and conclusions of law numbers 9, 10, and 13.

We overrule the Uptegraphs' second issue.

### Damages under Texas Property Code Section 202.004(c)

In their third issue, the Uptegraphs assert that the trial court erred in assessing $20,000 in civil damages under Texas Property Code section 202.004(c) because the damages were "unsupported by the evidence, against the great weight of the evidence, manifestly unjust, and erroneous as a matter of law." *See* TEX. PROP.CODE ANN. § 202.004(c) (Vernon 2007). The Uptegraphs cite to the trial court's find-

ings of facts numbers 41 and 42 and conclusion of law number 20.[16]

The Uptegraphs' challenge to the trial court's assessment of damages under section 202.004(c) is predicated on their assertion that a trial court may not assess damages under that statute unless there is evidence in the record that a violation of a restrictive covenant resulted in actual harm or injury for which compensation may be recovered. Essentially, the Uptegraphs argue that the evidence is legally and factually insufficient to support any damages because there was no—or insufficient—evidence of actual damages. We therefore first determine whether the damages that may be assessed by a trial court under section 202.004(c) are limited to compensation for actual injury or harm shown to have resulted from the violation of a restrictive covenant.

Section 202.004 of the Texas Property Code provides in pertinent part:

(b) A property owners' association or other representative designated by an owner of real property may initiate, defend, or intervene in litigation or an administrative proceeding affecting the enforcement of a restrictive covenant or the protection, preservation, or operation of the property covered by the dedicatory instrument.

(c) A court may assess civil damages for the violation of a restrictive covenant in an amount not to exceed $200 for each day of the violation.

TEX. PROP.CODE ANN. § 202.004(b), (c) (Vernon 2007).

---

16. The challenged findings and conclusion are:

    41. Defendants knowingly, intentionally and deliberately disregarded the restrictive covenants in constructing the fence in issue.

    42. Reasonable civil damages for Plaintiff in accordance with Texas Prop.Code § 202.004 are $20,000.00.

    20. Plaintiff is entitled to recover civil damages found above from Defendants pursuant to Texas Prop.Code § 202.004.

The damages awarded under subsection (c) of the statute are clearly discretionary with the court, and the language of section 202.004(c) suggests that the damages that may be assessed thereunder are punitive, rather than compensatory, in nature.[17] *See id.* § 202.004(c); *Air Park–Dallas Zoning Comm.,* 109 S.W.3d at 912 (holding that damages under section 202.004(c) discretionary with court and reviewing trial court's decision not to assess any damages under abuse of discretion standard). A statutory designation of a sum as "damages" does not govern its character and does not prevent it from being penal in nature. *See Johnson v. Rolls,* 97 Tex. 453, 79 S.W. 513, 514 (1904). Merely placing a label of "damages" on a statutory provision does not change its underlying character. *See Flores v. Millennium Interests, Ltd.,* 185 S.W.3d 427, 433 (Tex.2005). When a statute provided for an award of "liquidated damages" for a violation "without regard to the character of the act, or its effect on the rights of the 'person aggrieved,'" and there was "nothing in the law to indicate that there was any purpose to compensate the 'person aggrieved,'" the Texas Supreme Court held that such "damages" were intended as a punishment for the violation, regardless of whether the sum to be recovered was called a damage or a penalty. *See Johnson,* 79 S.W. at 514. The Texas Supreme Court has likewise construed a provision in the Texas Property Code that provides for "liquidated damages" of $250 per day as being penal in nature, despite the use of the term "damages," noting that the award

obviously bore no relation to the harm caused, if any harm was caused at all. *Flores,* 185 S.W.3d at 429, 433. The supreme court further held that nothing in the statute required proof of actual harm or injury for the recovery of the statutory damages, and to require proof of actual damages as a predicate to recovery was inconsistent with the conclusion that the damages provision was punitive rather than compensatory. *Id.* at 434. Recently, the Dallas Court of Appeals came to a similar conclusion involving a statutory award for violations of certain provisions of the Texas Financial Code, holding that a statute that provided an award of "not less than $100 for each violation" did not require proof of actual damages because nothing in the statute required a person to prove actual harm or injury to recover such statutory damages. *See Marauder Corp. v. Beall,* No. 05–08–00713–CV, 2009 WL 4199329, at *4 (Tex.App.-Dallas November 25, 2009, no pet. hist.).

Notably, the amount of damages that may be assessed under section 202.004(c) is not related to the showing of any type of injury or harm or the extent of such injury or harm; rather, it is related to the number of days that the violation takes place, without any reference to the nature, extent, or existence of any type of injury or harm. *See* TEX. PROP.CODE ANN. § 202.004(c). Nothing in section 202.004 indicates that the "damages" that the trial court may "assess" under subsection (c) are intended to be compensation for any actual harm or injury from the violation of

---

17. For example, section 202.004(c)

- states that a court may "assess damages," rather than stating that a particular party is "allowed" a recovery or is "entitled to" "recover" damages;
- permits a trial court discretion to "assess damages" rather than to "award damages";
- provides for an assessing of damages "for the violation," rather than for damages "resulting from" or suffered "as a consequence of" the violation; and
- provides for the assessment of damages on a per diem basis, relating the damages assessed to the number of days that the restrictive covenant is violated.

*See* TEX. PROP.CODE ANN. § 202.004(c).

the restrictive covenant. Finally, nothing in section 202.004 limits the trial court's assessment of "damages" under subsection (c) to compensation for actual harm or injury suffered as a result of the violation. *See id.* § 202.004.

In *Dickerson v. DeBarbieris,* our sister court of appeals noted that section 202.004(c) does not require that the damages assessed under that section correspond to damages actually suffered as a result of the violation of the restrictive covenant. *See Dickerson v. DeBarbieris,* 964 S.W.2d 680, 689–90 (Tex.App.-Houston [14th Dist.] 1998, no pet.). We agree and hold that the damages that may be assessed under section 202.004(c) are not limited to compensation for actual harm or injury from the violation of a restrictive covenant. Because there is no relation between the statutory damages that may be assessed under section 202.004(c) and any actual harm or injury from the violation, a trial court does not abuse its discretion in assessing damages under section 202.004(c) in the absence of evidence of actual damages.

We therefore reject the Uptegraphs' complaint that the trial court erred by assessing damages under section 202.004(c) in the absence of any—or sufficient—evidence of actual damages. Because we have held that evidence of actual damages is not a prerequisite to the assessment of damages under section 202.004(c), we likewise overrule the Uptegraphs' contentions that finding of fact 42 and conclusion of law number 20 were erroneous because there was no evidence, or insufficient evidence, of actual damages. We overrule the Uptegraphs' challenge to finding of fact 41, because the record supports the trial court's finding, but note that the section 202.004(c) does not require proof of any *mens rea* in the commission of a violation of a restrictive covenant before a trial court may assess damages; the statute merely requires a violation to have occurred. *See* TEX. PROP.CODE ANN. § 202.004(c).

We overrule the Uptegraphs' third issue.

### Conclusion

We affirm the judgment of the trial court.