# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-09-00452-CV

**La Ventana Ranch Owners' Association, Inc. and Interim La Ventana, LLC, Appellants //
William D. Davis, Hatton Revocable Trust (Dr. Craig Hatton and Sue Hatton), Jeffrey L.
Burnett, John Czop, Judy Czop, Kenneth R. Hamburger, Maria L. Hamburger, Mark E.
Lich, Steven Malone, Robert H. Hughes, Kay C. Hughes, Manley W. Crider, Anna M.
Crider, Allen Butt, Cindy Butt, Sharon M. Davis, Michael R. Perdue, Phyllis M.
Finnemore, Gregory Alec Gowins, Patrick C. Harkins, Sandra K. Harkins, and Jill R.
Davis, Cross-Appellants**

**v.**

**William D. Davis, Hatton Revocable Trust (Dr. Craig Hatton and Sue Hatton), Jeffrey L.
Burnett, John Czop, Judy Czop, Kenneth R. Hamburger, Maria L. Hamburger, Mark E.
Lich, Steven Malone, Robert H. Hughes, Kay C. Hughes, Manley W. Crider, Anna M.
Crider, Allen Butt, Cindy Butt, Sharon M. Davis, Michael R. Perdue, Phyllis M.
Finnemore, Gregory Alec Gowins, Patrick C. Harkins, Sandra K. Harkins, Jill R. Davis,
William Austin, and Linda Austin, Appellees // La Ventana Ranch Owners' Association,
Inc. and Interim La Ventana, LLC, Cross-Appellees**

---

### FROM THE DISTRICT COURT OF HAYS COUNTY, 428TH JUDICIAL DISTRICT
### NO. 07-0245, HONORABLE WILLIAM R. HENRY, JUDGE PRESIDING

---

## O P I N I O N

La Ventana Ranch Owners' Association ("the ROA") appeals from the trial court's

final judgment in this dispute arising from variances granted to certain homeowners within the La

Ventana community, allowing for the installation of private water wells and propane tanks. The

ROA contends that the trial court erred in declaring that certain water well variance documents were

valid and enforceable. Homeowners William D. Davis, Hatton Revocable Trust, Jeffrey L. Burnett,

John Czop, Judy Czop, Kenneth R. Hamburger, Maria L. Hamburger, Mark E. Lich, Steven Malone, Robert H. Hughes, Kay C. Hughes, Manley W. Crider, Anna M. Crider, Allen Butt, Cindy Butt, Sharon M. Davis, Michael R. Perdue, Phyllis M. Finnemore, Gregory Alec Gowins, Patrick C. Harkins, Sandra K. Harkins, and Jill R. Davis (collectively, "the Individual Homeowners") cross-appeal, arguing that the trial court erred in determining that members of the community's architectural committee violated a fiduciary duty to the members of the ROA by granting the variances. The Individual Homeowners further contend that the trial court erred in declaring the propane tank variance documents to be invalid. Interim La Ventana, LLC ("Interim-LV") appeals from the portion of the trial court's judgment awarding attorney's fees. We affirm the trial court's judgment in part, reverse and render in part, and remand for a redetermination of the appropriate amount of attorney's fees to be awarded.

## BACKGROUND

At all relevant times, the Individual Homeowners were property owners in the La Ventana residential community in Hays County, Texas.[1] The La Ventana community is governed by the Declaration of Covenants, Conditions and Restrictions for La Ventana ("the CCRs").[2] The CCRs establish the ROA as the homeowners' association for La Ventana, vesting it with the power to administer and enforce the terms and provisions of the CCRs. At the time this suit was filed, the

---

[1] Some of the Individual Homeowners were plaintiffs in the trial court, while others were added by the ROA as third-party defendants in connection with its counterclaim for declaratory judgment. All of the Individual Homeowners were recipients of the water well and propane tank variances.

[2] The parties agree that the Third Amended Declaration of Covenants, Conditions and Restrictions and its supplementing documents were in effect at all times relevant to this suit.

2

property developer for La Ventana was Driftwood Development, LP ("Driftwood"). Under the CCRs, Driftwood retained control and authority over the membership of the ROA's board of directors.[3]

The CCRs establish an Architectural Committee for La Ventana ("the AC"), to consist of voting members and non-voting members serving in an advisory capacity. The AC has the power to approve improvement requests, as well as grant variances from compliance with any provision of the CCRs when the AC determines, "in its sole and absolute discretion," that the requested variance will not impair or detract from the high quality development of La Ventana and "is justified due to unusual or aesthetic considerations, topographic or septic considerations, or unusual circumstances." All such variances must be in writing and signed by a majority of the voting members of the AC. Driftwood maintained the right to appoint and remove all members of the AC.

Of relevance to this appeal, section 3.23 of the CCRs provides that no portion of any lot in La Ventana shall be used for the purpose of drilling for or removing water. Section 3.45 prohibits the placement or maintenance of propane tanks or other structures for the storage of combustible fuel on any lot absent written authorization from the AC.

---

[3] The developer's control over the board of directors is described in the bylaws of the ROA, which are incorporated by reference into the CCRs. Prior to December 2006, Driftwood had control and authority to appoint and remove all members of the board of directors. In December 2006, the bylaws of the ROA were amended to allow the property owners to appoint two of the five members of the board of directors, subject to the approval of the existing directors. Driftwood retained the authority to appoint and remove the remaining three members of the board. Members of the ROA board of directors are not required to be La Ventana property owners.

3

In the spring and summer of 2006, the residents of La Ventana began to experience increasingly severe problems with their water service, including water shortages, inadequate water pressure, and unsafe drinking water. At that time, water service to La Ventana was provided by La Ventana Water Company, an entity composed of the same constituent members as Driftwood. In light of the water problems and what they perceived to be Driftwood's monopoly control over water service to the community, a number of La Ventana residents sought variances that would allow them to install private water wells on their property. Many of these residents also sought variances allowing them to install buried propane tanks, citing what they believed to be exorbitant gas prices charged by La Ventana's propane provider.

In November and December of 2006, the AC approved 24 water well variances and 23 propane tank variances for La Ventana property owners, filing the variance documents as public records in Hays County. The variances were approved based on the vote of two members of the AC, Sharon Davis and Manley Crider. The remaining members of the AC, Jeff Gonzales and Richard Kidd, were unaware of the variances prior to their execution and recording.[4] Upon learning of the variances, the ROA board of directors threatened legal action against any homeowners who relied on the variances to install buried propane tanks or water wells on their property. A number of the variance recipients then filed suit against Driftwood and the ROA, seeking a declaratory judgment regarding the validity of the variances. The plaintiffs later amended their petition to add Interim-LV

---

[4] The parties strongly dispute whether Richard Kidd was a voting member of the AC or an advisory, non-voting member.

as a defendant on the ground that Interim-LV had foreclosed on Driftwood's ownership interest in La Ventana.[5]

The ROA then filed an amended answer, counterclaim, and third-party petition, joining the remaining recipients of the variances as third-party defendants and seeking a declaratory judgment that the variances were invalid, as well as injunctive relief preventing the plaintiffs and third-party defendants from constructing, installing, or maintaining water wells or underground propane tanks on their property. Interim-LV also filed an answer, asserting that it could not be liable for acts or omissions of Driftwood by virtue of its purchase of Driftwood's rights and interests in La Ventana through foreclosure.

The plaintiffs and the ROA filed cross-motions for partial summary judgment on the issue of whether the variances were valid, with the ROA asserting that the variances represented improper waivers rather than "variances" within the meaning of the CCRs. The trial court granted partial summary judgment in favor of the plaintiffs, concluding that the AC granted the variances in accordance with its own authority and the requirements of the CCRs. The ROA subsequently amended its counterclaim and third-party petition to assert for the first time that at all relevant times, the AC consisted "of four voting members: Plaintiff Sharon Davis, Plaintiff Manley Crider, Jeff Gonzales and Richard Kidd," and therefore the variances were invalid because Davis and Crider did not represent a majority of the AC at the time they signed the variance documents. The ROA

---

[5] Specifically, the amended petition stated, "Plaintiffs have joined Defendant Interim-LV as a party defendant and hereby assert all claims for declaratory relief that have been made against [Driftwood] against Defendant Interim-LV. As the successor to [Driftwood], Defendant Interim-LV steps into the shoes of [Driftwood]."

5

reurged its request for declaratory and injunctive relief, and added claims for fraud and breach of fiduciary duty, arguing that by granting the variances, Davis and Crider committed fraud and breached their fiduciary duties to the property owners who did not receive variances.

The case proceeded to trial, and after hearing the evidence, the jury found that the water well and propane tank variances were granted by the AC in accordance with the CCRs. The jury further found that neither Crider nor Davis acted arbitrarily or capriciously in determining that granting the water well variances would not impair or detract from the high quality development of the La Ventana community and were justified due to unusual or aesthetic considerations, topographic or septic considerations, or unusual circumstances. With respect to the propane tank variances, on the other hand, the jury found that Crider and Davis acted arbitrarily and capriciously in making this determination. The jury also found that Crider and Davis breached fiduciary duties to the La Ventana property owners by granting the variances. With respect to attorney's fees, the jury found that the plaintiffs incurred reasonable and necessary fees in the amount of $400,000 in preparation for trial, would incur $20,000 in fees in the case of an appeal to this Court, and would incur $35,000 in fees in the case of an appeal to the supreme court.

The trial court entered judgment on the verdict, declaring that the water well variances, with the exception of those granted to Davis and Crider, were valid. The trial court further declared that Davis and Crider violated their fiduciary duty to the residents of La Ventana, and that their personal water well variances were invalid and/or void and of no force and effect. The trial court also declared all of the propane tank variances to be invalid and/or void and of no force and effect. The trial court awarded attorney's fees to the plaintiffs in the amount of $100,000 for trial,

6

$20,000 for an appeal to this Court, and $35,000 for an appeal to the supreme court, with the fee award to be paid solely by Interim-LV. Finally, the trial court enjoined all parties from interfering with attempts by the La Ventana Water Company to connect a second well to the community water system. The court later issued findings of fact and conclusions of law, finding that Crider and Davis did not profit from their breach of fiduciary duty.[6] This appeal followed.

**DISCUSSION**

*Validity of Water Well Variances*

In its first issue on appeal, the ROA argues that the trial court erred in declaring the water well variances valid because the purported variances actually constitute waivers, which the AC has no authority to grant. This issue was decided in the trial court's order on partial summary judgment, in which the trial court determined that the "variances at issue in this suit were variances within the meaning of Section 5.7(d) of the [CCRs]" and that the AC "had authority pursuant to the [CCRs] to Grant the specific variances at issue in this case." We review a trial court's ruling on summary judgment de novo. *See Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). Restrictive covenants are subject to the general rules of contract construction. *Pilarcik v. Emmons*, 966 S.W.2d 474, 479 (Tex. 1998). Our primary duty in construing a restrictive covenant is to ascertain the drafter's intent from the plain language of the instrument, affording

---

[6] The jury charge included questions on whether Crider or Davis received a benefit from any transaction with the La Ventana homeowners, but these questions were conditioned on the answer to a previous question and were left unanswered.

words and phrases their commonly accepted meanings. *See Uptegraph v. Sandalwood Civic Club*, 312 S.W.3d 918, 925 (Tex. App.—Houston [1st Dist.] 2010, no pet.).

In contending that the AC was not authorized to grant the purported variances, the ROA argues that there is an important distinction between "waivers" and "variances," with variances constituting permission to perform an act contrary to the usual rule, while waivers have the effect of abolishing the rule forever. According to the ROA, the variances in this case actually constitute unauthorized waivers because they abolish any and all restrictions that would otherwise prevent a landowner from installing a private water well or underground propane tank on his or her property. This position ignores the plain language of section 5.7(d) of the CCRs, which provides as follows:

> The [AC] may grant variances from compliance with any of the provisions of this Declaration or any Supplemental Declaration, including, but not limited to, restrictions upon height, bulk, size, shape, floor areas, land area, placement of structures, set-backs, building envelopes, colors, materials, or land use, when in the opinion of the [AC], in its sole and absolute discretion, such variances will not impair or detract from the high quality development of the Property and such variance is justified due to unusual or aesthetic considerations, topographic or septic considerations, or unusual circumstances. All variances must be evidenced in writing, in recordable form, and must be signed by at least a majority of the Voting Members of the [AC]. If a variance is granted, no violation of the covenants, conditions, or restrictions contained in this Declaration or any Supplemental Declaration shall be deemed to have occurred with respect to the matter for which the variance was granted. The granting of such a variance shall not operate to waive any of the terms and provisions of this Declaration or any Supplemental Declaration for any purpose except as to the particular Property and in the particular instance covered by the variance.

The last sentence of section 5.7(d), specifically stating that the granting of a variance does not operate as a waiver "except as to the particular Property and in the particular instance covered by the variance," reflects that the AC is authorized to grant variances that waive a term or

provision of the CCRs, provided this waiver is limited to a particular property and instance. Here, each of the water well and propane tank variances is appropriately limited, waiving terms and provisions of the CCRs only with respect to a particular property and instance. The water well variance documents permit the grantee to use a portion of his or her lot to "quarry, drill, bore, or explore for water." The propane tank variance documents permit the grantee to install and use "a buried propane tank . . . to receive, store, and provide onsite propane" for his or her lot. These variance documents do not suspend the application of the CCRs in all instances. Rather, they waive terms and provisions of the CCRs only with respect to the drilling of a private well or the installation of a buried propane tank on a particular lot. Because the plain language of section 5.7(d) of the CCRs authorizes the AC to grant variances waiving the applicability of terms and provisions of the CCRs with respect to a particular property and "in the particular instance covered by the variance," we conclude that the variances at issue here are not unauthorized waivers, but variances within the meaning of the CCRs. The ROA's first issue is overruled.

In its second issue, the ROA contends that the evidence is legally insufficient to support the jury's finding that the variances were properly granted in accordance with the CCRs. Specifically, the ROA argues that the evidence is insufficient to support a finding that Sharon Davis and Manley Crider represented a majority of the voting members of the AC at the time they signed the variances. According to the ROA, there were four voting members of the AC at all relevant times—Sharon Davis, Manley Crider, Jeff Gonzalez, and Richard Kidd—and therefore the variances were not signed by a majority of the voting members as required by the CCRs. The Individual Homeowners, on the other hand, contend that Richard Kidd was merely a non-voting advisory

9

member of the AC, and therefore that Davis and Crider represented a majority of the voting members at the time they signed the variances.

In reviewing a jury verdict for legal sufficiency, we review the evidence in the light most favorable to the judgment, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005). We will sustain a legal sufficiency challenge if (1) the record reveals the complete absence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact. *Id.* at 810. More than a scintilla of evidence exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004).

Section 5.1(a) of the CCRs provides that the AC shall consist of not less than one and not more than seven voting members, "and such additional non-voting members serving in an advisory capacity" as the developer deems appropriate. The developer retains the right to appoint and remove all members of the AC. In March 2006, Driftwood agreed to allow the La Ventana property owners to elect three of their fellow property owners to serve as voting members of the AC, subject to Driftwood's right of removal. Driftwood also agreed to allow the property owners to elect two members of the ROA board of directors, again subject to Driftwood's right of removal. After an election in March 2006, Davis, Crider, and Gonzalez were elected to the AC, and Brian Fenske

10

and Richard Kidd were elected to the ROA board of directors.[7]  The minutes from an April 19, 2006 meeting of the ROA board of directors, entered into evidence at trial, indicate that the existing directors "confirmed the election of Mr. Fenske and Mr. Kidd as directors and the election of Sharon [Davis], Manley Crider and Jeff Gonzalez as members of the [AC]."

In a May 2, 2006 meeting, the ROA board of directors discussed a new online program for tracking the AC's review of home plan submissions.  The meeting minutes, also entered into evidence, note this discussion and indicate that "Jerry Thompson, Ken Martin, Richard Kidd and Brian Fenske would initially take part in the [AC] review process to get familiar with the software and its use."  Minutes from a June 5, 2006 board meeting reflect that the board "discussed the progress made by the [AC] to utilize the online tracking/approval system" and "agreed that Messrs. Fenske, Martin and Thompson would no longer take part in the [AC] process, but that Messrs. Fenske and Martin would continue to have access to the online program for monitoring purposes."  The board further agreed that "Mr. Kidd would serve as liaison between the Board and the [AC] and attend the [AC] meetings."

The board meeting minutes memorialize the election of Davis, Crider, and Gonzalez to the AC as voting members, but simply identify Kidd as a liaison between the ROA board of directors and the AC.  The board's decision that Kidd would "initially take part" in the AC review process in order to gain familiarity with the software and its subsequent decision that Kidd should

_____

[7] The existing directors at the time of the election were Ken Martin, Kelly Wilnes, and Jerry Thompson, Driftwood's limited partners.  These individuals were also the managing members of Driftwood's general partner, Parkland LLC.

11

continue to attend AC meetings as a board liaison indicate that the board did not view Kidd as a regular, voting member of the AC.

In addition to the ROA board meeting minutes, the jury was also presented with a proposed funding agreement between Driftwood and the ROA, copies of which were distributed to La Ventana property owners for approval in September 2006. A summary letter accompanying the agreement, which was signed by Richard Kidd, Brian Fenske, and four other La Ventana homeowners, contained the following language:

> We note that [Driftwood] has already allowed the lot owners to elect all three voting members of the [AC] and that [Driftwood] does not have any voting members on this committee, which allows lot owners to ensure that any plans submitted for houses or other improvements comply with the CCRs.

By referring to "all three voting members," Kidd and the other letter writers represented to the La Ventana community that the AC consists of no more than three voting members.[8] This language is repeated in the funding agreement itself, which states, "We note that [Driftwood] has already allowed lot owners to elect all three voting members of the [AC], which . . . is responsible for insuring that house plans and plans for other improvements that are submitted comply with the CCRs."

The ROA argues that because only Driftwood had the power to appoint or remove members of the AC, the funding agreement letter and the ROA board meeting minutes are irrelevant

---

[8] The statement that Driftwood "does not have any voting members" on the AC could suggest that Driftwood had not appointed any additional voting members beyond those members elected by the property owners, but could also be read as a statement that Driftwood had not appointed any of its individual limited partners to the AC as voting members.

in determining whether Kidd was a voting member because they do not represent statements by Driftwood. However, the minutes themselves reflect that Kidd, Fenske, and all three individuals in control of Driftwood were present at these meetings in their capacities as directors of the ROA. If Kidd had been appointed by Driftwood as a voting member to the AC, any individual with direct knowledge of that appointment would have been present at the ROA board meetings. In addition, the funding agreement letter was signed by Kidd himself, who testified that he read the letter carefully before it went out, including the language indicating that the only voting members of the AC were the three members elected by the homeowners. Jerry Thompson, a Driftwood principal and member of the ROA board of directors, also testified that he reviewed the funding agreement and accompanying summary letter at the time they were drafted. When asked if anything included in the agreement or letter had jumped out in his mind as being untrue, Thompson stated that he could not remember.[9]

Multiple witnesses testified at trial regarding the online approval system referenced in the ROA board meeting minutes. This system allowed the voting members of the AC to record their votes online when approving submitted plans and specifications. Once all votes had been cast with respect to a particular project, the votes would be finalized using what was referred to at trial

---

[9] We note also that the ROA's own pleadings indicate its initial position that Kidd was not a voting member of the AC. In its amended answer and counterclaim, ROA alleged that "[a]t all relevant times, the Architectural Committee consisted of three voting members: Plaintiff Sharon Davis, Plaintiff Manley Crider, and Jeff Gonzales, and one non-voting member: Richard Kidd." The pleading later alleged that "non-voting member Richard Kidd" was unaware of the variances at the time Davis and Crider signed them. In its motion for partial summary judgment, the ROA again stated that "Plaintiff Sharon Davis, Plaintiff Manley Crider, and Jeff Gonzales were elected as Voting Members of the Architectural Committee" and that "Richard Kidd was appointed by [Driftwood] as an Advisory Member of the Architectural Committee."

13

as the "hot button." When the approval software was implemented, Kidd was designated by Driftwood as the operator of the hot button. Davis testified that pressing the hot button did not actually cast a vote, but simply confirmed that all necessary votes had been cast and that the voting was complete. While the ROA produced written records from the online approval system, some of which reflect Kidd's "user vote" as "Approved," Davis testified that these records merely reflected Kidd's use of the hot button, stating, "[H]e hit the hot button . . . and this is how it came out." She further clarified that as operator of the hot button, Kidd was not logging on and voting on projects, but "logging on and saying that everybody had voted."[10] Christine Gamache, a representative of La Ventana's property management company at the time of the events in question, disagreed with this characterization, testifying that the individual assigned to operate the hot button must be a voting member of the AC because the hot button represented "actual final approval."

Davis also testified that based on Kidd's representations to her, she believed that she, Crider, and Gonzalez were the only voting members of the AC, and that Kidd served only as a non-voting member and liaison to the ROA board of directors. Davis maintained that Driftwood never notified her that Kidd had been appointed to the AC as a voting member. Davis also testified that during AC meetings, Kidd would participate in the discussion and often indicated how he would vote on a particular project "if he could vote." Similarly, Crider testified that while Kidd participated in AC meetings and discussions, "his vote did not count." Crider further testified that he never received notice from Driftwood that Kidd had been appointed as a voting member, and that he

---

[10] Kidd testified that his responsibility for the hot button was transferred to Davis in late summer 2006.

understood Kidd's role to be a non-voting member serving as a liaison between the AC and the ROA board. When asked whether Kidd actually submitted votes using the online approval system, Crider answered, "I can't say that. I don't think he did. All he did was have the hot button."

In support of its position that Kidd was a voting member of the AC, the ROA presented testimony from Kidd and other former members of the ROA board of directors. Kidd testified that one of the Driftwood partners, Ken Martin, asked him to serve on the AC in April or May of 2006. According to Kidd, Martin requested that he take on "the manager's role," which "basically involved the hot button." Kidd explained that the manager was to press the hot button "after each member voted . . . in order to finalize the voting." Kidd did not explain whether pressing the hot button actually constituted a vote, but he did testify that he submitted votes on AC matters using the online system.

Fenske, who prepared the ROA board meeting minutes, testified that Kidd became a voting member of the AC after a board meeting in which someone from Driftwood "asked Richard Kidd or I which one of us also wanted to be a voting member." When asked why he did not record this particular discussion in the minutes, Fenske explained that it was "not a board issue." Fenske acknowledged that the minutes do, however, note the election of Davis, Crider, and Gonzalez as voting members of the AC. When asked whether the online system allowed anyone with access to the system to register an approval on a particular request, regardless of whether they were actually voting members of the AC or even members of the AC at all, Fenske answered in the affirmative. This testimony suggests that because Kidd had access to the online approval system, he would not necessarily have been prevented from entering votes on certain projects, even if he had not been appointed to the AC as a voting member.

Jerry Thompson, a member of the ROA board of directors and a limited partner in Driftwood, testified that at the time Davis, Crider, and Gonzalez were elected as voting members of the AC, he and Ken Martin were already serving as voting members. He further testified that he and Martin appointed Fenske and Kidd to the AC at around the same time, bringing the total number of voting members to seven.[11] Thompson stated that Fenske "eventually rolled off [the AC] along with myself and Ken Martin," but that Kidd remained on the AC throughout Driftwood's involvement with La Ventana. Thompson could not provide the exact date that Fenske and Kidd were appointed, nor did he specify when he, Martin, or Fenske ceased to be voting members of the AC.

Martin, another member of the ROA board and limited partner in Driftwood, testified that Driftwood appointed Kidd to the AC as an advisory member in April 2006, and that Kidd became a voting member in May or June 2006. Martin further testified that Kidd could not have operated the hot button unless he was a voting member of the AC.

Reviewing the totality of the evidence presented at trial, we note the representation in a letter signed by Kidd that "all three voting members" had been elected by the homeowners, board meeting minutes memorializing the election of the voting members, but specifying Kidd's role as liaison between the AC and the ROA board, and conflicting testimony regarding Kidd's use of the online voting software and the effect of any actions he may have taken with respect to that software. While Driftwood principals Thompson and Martin both testified that Driftwood had appointed Kidd to the AC as a voting member, the jury was free to evaluate the credibility of the witnesses and the weight to be given their testimony. *See McGalliard v. Kuhlmann*, 722 S.W.2d

---

[11] The record reflects that on April 12, 2006, the CCRs were amended to increase the maximum number of voting members on the AC from four to seven.

694, 696 (Tex. 1986). In making this determination, the jury may have taken into account Kidd's August 2006 resignation letter from the ROA board of directors, which was entered into evidence and included statements by Kidd that Martin "had lied [to him] directly" regarding the construction of a water tank at La Ventana and that Driftwood could not seem to "tell the truth."

Viewing all of the evidence in the light most favorable to the judgment, it rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *See Ford Motor Co.*, 135 S.W.3d at 601. We therefore conclude that more than a scintilla of evidence exists to support a finding that Kidd was not a voting member of the AC at the time the variances were signed and therefore that Davis and Crider represented a majority of the voting members. *See City of Keller*, 168 S.W.3d at 807; *see also Ridgway*, 135 S.W.3d at 601. Further, we cannot say that the opposing evidence is sufficient to conclusively disprove this finding. *See City of Keller*, 168 S.W.3d at 810. As a result, we hold that the jury finding that Davis and Crider signed the variances in accordance with the CCRs is supported by legally sufficient evidence. We overrule ROA's second issue on appeal.

*Breach of Fiduciary Duty*

In their first issue on cross-appeal, the Individual Homeowners argue that there is legally and factually insufficient evidence to support the jury's finding that Crider and Davis breached a fiduciary duty to the remaining La Ventana property owners by granting the variances. Specifically, the Individual Homeowners contend that no fiduciary relationship existed between voting members of the AC and the La Ventana property owners.

17

Fiduciary duties arise as a matter of law in certain formal relationships, such as attorney-client or trustee relationships. *See Meyer v. Cathey*, 167 S.W.3d 327, 330 (Tex. 2005) (per curiam); *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 593-94 (Tex. 1992). In addition, an informal fiduciary duty may arise from a moral, social, domestic, or purely personal relationship of trust and confidence. *Associated Indem. Corp. v. Cat Contracting Co.*, 964 S.W.2d 276, 287-88 (Tex. 1998). However, "not every relationship involving a high degree of trust and confidence rises to the stature of a fiduciary relationship." *Meyer*, 167 S.W.3d at 330 (quoting *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 176-77 (Tex. 1997)). The existence of a confidential relationship giving rise to an informal fiduciary duty is ordinarily a question of fact, but it becomes a question of law when there is no evidence of such a relationship. *Crim Truck & Tractor*, 823 S.W.2d at 594.

In the present case, the jury was asked whether "a relationship of trust and confidence" existed between Crider and Davis and the La Ventana property owners. These questions were accompanied by the following instruction:

> A relationship of trust and confidence existed if the La Ventana Homeowners justifiably placed trust and confidence in [Davis or Crider] as a Voting Member of the Architectural Committee to act in the best interest of the La Ventana Homeowners. The La Ventana Homeowners' subjective trust and feelings alone do not justify transforming arm's-length dealings into a relationship of trust and confidence.

The jury answered both questions in the affirmative, finding that a relationship of trust and confidence existed between Crider and Davis and the La Ventana property owners. The jury was then asked whether Crider and Davis complied with their fiduciary duties to the La Ventana property

18

owners. As to both Crider and Davis, the jury answered, "No," resulting in the trial court's declarations that Crider and Davis breached their fiduciary duties and that the water well variances granted to Crider and Davis were invalid and/or void and of no force and effect.

On appeal, the Individual Homeowners argue that the evidence is insufficient to establish that the La Ventana property owners justifiably placed trust and confidence in Davis and Crider, as voting members of the AC, to act in the property owners' best interest. The role of the AC is described by the CCRs, which define it as a committee created "to review and approve Plans and Specifications for the construction of Improvements upon the Property." The AC's powers and responsibilities include the authority to disapprove proposed improvements based on the restrictions found in the CCRs, the power to review works in progress and require non-conforming developments to be demolished and removed at the owner's expense, the authority to establish and collect a fee from property owners for each set of plans and specifications submitted for its review, and the ability to charge a fee to consider requests for variances. On its face, the authority to enforce the restrictive covenants imposed by the property developer against individual property owners, including charging fees and requiring the removal of developments at the owner's expense, would not appear to convey a special relationship of trust and confidence with property owners.[12]

The CCRs also provide that the developer maintains the right to appoint and remove AC members. As this litigation indicates, the relationship between the La Ventana homeowners and the community's developers has been antagonistic at best. The jury heard a substantial amount of testimony regarding the conflicts between Driftwood and the La Ventana homeowners, particularly

---

[12] The CCRs were signed and executed by Driftwood's predecessor, La Ventana Driftwood, LP.

regarding the Driftwood-controlled water service provider. In this context, the fact that Driftwood controlled the membership of the AC would preclude the homeowners from justifiably expecting the AC to protect their interests over those of Driftwood, particularly given the evidence presented at trial of the perception in the La Ventana community that the interests of the developers and the property owners had significantly diverged.

Finally, the CCRs expressly state that members of the AC shall not be liable to any property owner or other person for loss, damage, or injury arising out of their service on the AC, provided the loss, damage, or injury is not due to the member's willful misconduct. This waiver of liability for any acts other than willful misconduct further indicates that the relationship between voting members of the AC and the property owners was kept at arm's length.

The ROA takes the position that the relationship of trust and confidence between the voting members of the AC and remaining La Ventana property owners was established by the testimony of Davis and Crider regarding their perceptions of their role as voting members of the AC. Davis testified that as a member of the AC, she had a duty to act in the best interest of the community. When asked whether she was "entrusted like a politician might be entrusted, to act in the best interest of their constituents," Davis answered, "Definitely." Similarly, Crider testified that as a voting member of the AC, he owed a duty to the community to act in the best interest of the property owners and that by electing him to the AC, the La Ventana property owners placed him "in a position of trust to determine what was going to happen in the community." The subjective opinions of Davis and Crider regarding their perception of their role as members of the AC, however, say nothing about the actual trust and confidence placed in them by the property owners themselves, nor are they dispositive as to whether, based on the nature of the relationship between the AC and

20

the property owners, the property owners were *justified* in placing trust and confidence in voting members of the AC to act in their best interest. *See Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex. 1962) (holding that informal fiduciary duty was not established where parties did not testify to facts "other than their own subjective feelings" to show that relationship was one of trust and confidence). The jury was properly instructed as to this point, given the language in the charge stating that "[t]he La Ventana Homeowners' subjective trust and feelings alone do not justify transforming arm's-length dealings into a relationship of trust and confidence."

Furthermore, the fact that Davis and Crider were elected to their positions as voting members of the AC is not sufficient to place them in a position of trust and confidence with respect to the La Ventana property owners. First, the record contains no evidence indicating the percentage of La Ventana homeowners who voted in the election, the percentage of the overall vote received by Davis or Crider in their respective races, or the number of La Ventana properties sold to new owners after the election. Consequently, the election of Davis and Crider by the vote of certain property owners could not be sufficient to establish a relationship of trust and confidence with respect to all property owners, including those who may not have voted for Davis or Crider or even voted at all. More importantly, the ROA has not identified any authorities to suggest that an elected official owes a fiduciary duty to any or all of his or her constituents, and for good reason. Even assuming that the act of casting a vote could be considered sufficient to justifiably confer trust and confidence in an individual to act in the voter's best interests, this trust and confidence could not extend to those constituents who did not vote for that particular official. Thus, the fact that Crider and Davis were elected to the AC has no bearing on the issue of whether a relationship of trust and

confidence arose between Crider and Davis and the La Ventana property owners sufficient to establish an informal fiduciary relationship.

Other than testimony regarding the subjective beliefs of Davis and Crider, the ROA points to no evidence to suggest that a relationship of trust and confidence existed between the voting members of the AC and the La Ventana property owners. *See Trostle v. Trostle*, 77 S.W.3d 908, 914 (Tex. App.—Amarillo 2002, no pet.) (stating that existence of fiduciary relationship must be based on "actual facts of the relationship between the persons," rather than subjective beliefs). Accordingly, we hold that the evidence is legally insufficient to uphold the finding that an informal fiduciary relationship arose between Davis and Crider and the La Ventana property owners. We sustain this issue on cross-appeal and reverse the trial court's declarations that Davis and Crider breached a fiduciary duty to the La Ventana property owners and that the water well variances granted to Davis and Crider were invalid and/or void and of no force and effect. In light of our determination that no fiduciary relationship existed, we need not reach the Individual Homeowners' second issue on cross-appeal, in which they challenge the jury's findings that Davis and Crider failed to comply with their fiduciary duties.

*Propane Tank Variances*

In their third issue on cross-appeal, the Individual Homeowners argue that the trial court erred in invalidating the propane tank variances based on the jury's finding that Davis and Crider acted arbitrarily and capriciously in granting the variances.

After finding that the propane tank variance documents were signed by a majority of the voting members of the AC in accordance with the CCRs, the jury was asked:

Do you find that Manley Crider and/or Sharon Davis acted arbitrarily and capriciously in determining that granting the Propane Tank Variance Documents would not impair or detract from the high quality development of the La Ventana Community and was justified due to unusual or aesthetic considerations, topographic or septic considerations, or unusual circumstances?

The jury answered this question in the affirmative. Based on the jury's finding, the trial court declared the propane tank variances to be "invalid and/or void and of no force or effect."

The CCRs provide that the AC is authorized to grant a variance "when in the opinion of the [AC], in its sole and absolute discretion, such variance will not impair or detract from the high quality development of the Property and such variance is justified due to unusual or aesthetic considerations, topographic or septic considerations, or unusual circumstances." This provision leaves the necessary determinations up to the "sole and absolute discretion" of the AC.

The arbitrary-and-capricious standard appearing in the jury charge is premised on the language of property code section 202.004(a), which provides that "[a]n exercise of discretionary authority by a property owners' association or other representative designated by an owner of real property concerning a restrictive covenant is presumed reasonable unless the court determines by a preponderance of the evidence that the exercise of discretionary authority was arbitrary, capricious, or discriminatory." Tex. Prop. Code Ann. § 202.004(a) (West 2007). As an initial matter, the Individual Homeowners argue that section 202.004(a) does not apply because the AC is not a "property owners' association." *See id.* This argument ignores the plain language of section 202.004(a), which references not only property owners' associations, but "other representatives designated by an owner of real property" to enforce restrictive covenants. *Id.* Because the CCRs vest the AC with the power to exercise the necessary authority to enforce the terms and provisions

23

of the CCRs, the AC qualifies as a representative designated to enforce restrictive covenants for purposes of section 202.004(a).[13]

Section 202.004(a) creates a rebuttable presumption that a property owners' association or other representative acts reasonably in exercising its discretionary authority. *See id*. The La Ventana CCRs, however, do not incorporate a reasonableness standard for decisions of the AC. Rather, the CCRs expressly grant the AC "sole and absolute discretion" in reaching the determinations necessary to grant a variance. By definition, a matter of "absolute discretion" is unreviewable. *See In re Pirelli Tire, L.L.C.*, 247 S.W.3d 670, 683 & n.14 (Tex. 2007) (Willett, J., concurring) (citing statute foreclosing appellate review of certain decisions as example of legislature granting "absolute discretion" to trial courts); *Lucas v. United States*, 757 S.W.2d 687, 718 (Tex. 1988) (Phillips, C.J., dissenting) (characterizing decision left to "absolute discretion" of legislature as a choice free from "judicial re-evaluation"); *Williams v. State*, 592 S.W.2d 931, 932 (Tex. Crim. App. 1979) (describing trial court's decision to proceed with adjudication of guilt as "one of absolute discretion" where statute in effect at that time prohibited appellate review of such decisions); *see also Uptegraph*, 312 S.W.3d at 925 (holding that instruments imposing restrictive covenants are to be interpreted according to their plain language).

In light of the plain language of the CCRs granting the AC "sole and absolute discretion" to determine whether the necessary conditions for granting a variance have been met, we conclude that the arbitrary-and-capricious standard set forth in section 202.004(a) is inapplicable to

---

[13] This Court has previously applied section 202.004(a) to the actions of an architectural control committee. *See Hardee v. Westminster Glen Phase I Homeowner's Ass'n*, No. 03-00-00445-CV, 2001 Tex. App. LEXIS 1474, at *9 (Tex. App.—Austin Mar. 8, 2001, no pet.).

this determination. While the jury found that Crider and Davis acted arbitrarily and capriciously in determining that the propane tank variances would not impair or detract from the high quality development of La Ventana Community and that they were justified due to unusual or aesthetic considerations, topographic or septic considerations, or unusual circumstances, this finding is legally irrelevant to the validity of the variances. Under section 202.004(a), the arbitrary-and-capricious finding does nothing more than rebut the presumption that the AC acted reasonably in reaching a decision that, under the terms of the CCRs, is not reviewable for reasonableness. Crider and Davis, acting as a majority of the voting members of the AC, granted the variances after determining, in their "sole and absolute discretion," that the necessary conditions for granting a variance had been met. That is all that was required by the CCRs. We therefore sustain the Individual Homeowners' third issue on appeal and reverse the trial court's declaration that the propane tank variances are invalid and/or void and of no force and effect.

*Attorney's Fees*

In its first issue on appeal, Interim-LV argues that the trial court abused its discretion in ordering the plaintiffs' attorney's fees to be paid by Interim-LV as the successor to Driftwood. *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.009 (West 2008) (trial court may award reasonable and necessary attorney's fees as are equitable and just). The determination of whether a particular fee award is equitable and just is a matter of discretion for the trial court. *See Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998).

Interim-LV takes the position that it was never a proper defendant in the lawsuit because it was only added as "an additional real party in interest" and because no claims were

25

asserted directly against it. Interim-LV further characterizes its role in this dispute as being "in the same position as the other lot owners . . . who did not obtain variances." On this basis, Interim-LV contends that the trial court abused its discretion in requiring it to pay the plaintiffs' attorney's fees.

Interim-LV was added to the suit in the plaintiffs' first amended petition, which alleges:

> Since the filing of Plaintiffs' Original Petition, Defendant Interim-LV has foreclosed on [Driftwood's] ownership interest in La Ventana and appears to be an additional real party in interest. Therefore, in order to ensure that all proper, interested parties are before the court, Plaintiffs have joined Defendant Interim-LV as a party defendant and hereby assert all claims for declaratory relief that have been made against [Driftwood] against Defendant Interim-LV. As the successor to [Driftwood], Defendant Interim-LV steps into the shoes of [Driftwood].

Thus, despite Interim-LV's assertions that no claims were brought against it, the plaintiffs' claims for declaratory relief against Driftwood were reurged against Interim-LV as Driftwood's successor. Interim-LV was added to the suit, not merely as a real party in interest, but as a defendant.

After being added to the suit by the plaintiffs' amended petition, Interim-LV filed an answer, stating that it "cannot be liable for any acts or omissions of [Driftwood] or [the ROA] by virtue of its purchase of [Driftwood's] rights and interests in La Ventana at the foreclosure sale." Interim-LV further asserted an affirmative defense that no monopoly power existed with respect to the propane service at La Ventana because the CCRs allowed individuals to opt out of the service.

By purchasing Driftwood's rights and interests in La Ventana, Interim-LV succeeded Driftwood as the "Declarant" under the CCRs.[14] The CCRs state that "mere conveyance of a portion

---

[14] The CCRs define "Declarant" as La Ventana Driftwood, L.P. and its successors or assigns. La Ventana Driftwood, L.P. was Driftwood's predecessor as the property developer of La Ventana.

of the Property without written assignment of the rights of Declarant shall not be sufficient to constitute an assignment of the rights of Declarant hereunder." However, by Interim-LV's own representation in its original answer, it did not merely acquire a portion of the property, but purchased Driftwood's "rights and interests in La Ventana" at foreclosure.

As the Declarant under the CCRs, Interim-LV assumed "control and authority to appoint" three of the five members of the board of directors of the ROA. The remaining two members may be appointed by the property owners, but only with the approval by the existing board. In addition, both Davis and Crider testified regarding Interim-LV's efforts to gain control of La Ventana Water Company and obtain permission from the Texas Commission on Environmental Quality (TCEQ) to acquire Driftwood's Certificate of Convenience and Necessity, which permits the retail provision of water services. The record also includes documentation from TCEQ stating that "La Ventana development and water system are currently in bankruptcy and assets are held by an entity known as [Interim-LV]."

Interim-LV's contention that it is in the same position as "the other lot owners . . . who did not obtain variances" is belied, not only by the fact that Interim-LV controlled the ROA board of directors and succeeded Driftwood as Declarant under the CCRs, but also by the fact that it filed an answer and asserted an affirmative defense in this suit. Interim-LV did not, however, appear at trial to defend itself from the declaratory-judgment claims brought against it as Driftwood's successor.

---

It is undisputed that Driftwood was the Declarant under the CCRs at the time suit was filed, although foreclosure proceedings were already underway.

Finally, while Interim-LV claims that it was not impacted in any way by the trial court's judgment, it remains bound, as the Declarant and the entity in control of the ROA, by the trial court's declarations regarding the validity of the water well variances. It is also bound by the trial court's injunction, which enjoins all parties "from interfering, either directly or indirectly, with any attempts by the La Ventana Water Company to connect a second well to the La Ventana community water system."

Under the circumstances, including Interim-LV's role as Driftwood's successor, its control over the board of directors of the ROA, and the fact that it filed an answer but did not appear at trial to defend against the declaratory-judgment claims brought against it, we hold that the trial court did not abuse its discretion in ordering the plaintiffs' attorney's fees to be paid by Interim-LV. Interim-LV's first issue on appeal is overruled.

In its second issue on appeal, Interim-LV argues that the evidence on attorney's fees is factually insufficient to establish that the fees awarded were reasonable and necessary. In reviewing the factual sufficiency of the evidence to support a jury finding, we must consider and weigh all the evidence and should set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam).

In any proceeding under the Texas Uniform Declaratory Judgments Act ("UDJA") the trial court "may award costs and reasonable and necessary attorney's fees as are equitable and just." Tex. Civ. Prac. & Rem. Code Ann. § 37.009. Whether fees are reasonable and necessary is an issue of fact to be determined by the fact-finder. *See Bocquet*, 972 S.W.2d at 21. The jury in this case found the reasonable and necessary attorney's fees to be $400,000 through trial, $20,000 for an

28

appeal to this Court, and $35,000 for an appeal to the supreme court. In its final judgment, the trial court exercised its discretion by reducing the $400,000 award for trial fees to $100,000, but awarded appellate fees consistent with the jury's findings. *See id.* (stating that matters of equity, such as determination of whether fee award is equitable and just, are left to trial court's discretion).

The plaintiffs' evidence on attorney's fees was limited to the testimony of their attorney, Ed Watt. Despite Interim-LV's argument to the contrary, the expert testimony of an interested witness, standing alone, can be sufficient to support the reasonableness and necessity of a fee award. *See Whitmire v. Greenridge Place Apartments*, 333 S.W.3d 255, 264 (Tex. App.—Houston [1st Dist.] 2010, pet. filed); *Gutierrez v. Elizondo*, 139 S.W.3d 768, 777 (Tex. App.—Corpus Christi 2004, no pet.); *Burnside Air Conditioning & Heating, Inc. v. T.S. Young Corp.*, 113 S.W.3d 889, 898 (Tex. App.—Dallas 2003, no pet.); *Hugh Wood Ford, Inc. v. Galloway*, 830 S.W.2d 296, 298 (Tex. App.—Houston [14th Dist.] 1992, writ denied).

Watt testified that his normal hourly rate is $300, but that he applied a multiplier of one-and-a-half times the usual rate to account for the contingent-fee nature of the case, resulting in an hourly rate of $450. Watt also testified that based on his experience as a litigator in Hays County, an hourly rate of $300 would be reasonable and customary in the area for a non-contingent case, and that a rate of $450 after application of a contingent-fee multiplier would be reasonable and "standard for contingent fee work of this nature." Watt also testified to the hourly rate of the other attorneys and legal assistants in his office, ranging from $120 to $300 based on each individual's role and level of experience.

Watt further testified to the number of hours that he and his staff spent on the case, including a projected number of hours to cover the remainder of trial. Watt pointed out that the

29

hours incurred "consisted, in part, of gearing up for trial twice. This case was originally scheduled for trial back in December and then at the last minute got postponed until now." Watt then calculated the total fee amount through the conclusion of trial to be $357,375, but explained that he would only be entitled to recover ninety-five percent of that amount, or $339,506, because he allocated five percent of the total to the time he spent representing the individual homeowners that were added to the suit as third-party defendants. Watt estimated that there would be an additional $10,000 in fees to respond to a motion for new trial, $20,000 to $25,000 in the case of an appeal to this Court, and $20,000 in the case of an appeal to the supreme court.[15]

With respect to the services performed, Watt testified that the work done was reasonable and necessary in light of the complexity of the case, the number of parties involved, the amount of research required, the amount of discovery conducted, and the number of hearings involved. He stated, "[W]e have engaged in all the things that were necessary in order to be able to handle this case adequately and professionally. So I believe that the time spent is time that has necessarily been spent."

Counsel for the ROA also testified regarding his opinion of Watt's fees, stating that he believed the amount of time Watt spent on the case to be reasonable, but disagreed with the application of the contingent-fee multiplier. Specifically, the ROA's counsel testified that in his opinion, Watt did not spend "some unreasonable amount of time . . . . My time is probably not too

---

[15] On cross-examination, Watt testified that certain individual plaintiffs had paid him a total of $23,000 directly to assist them in removing lis pendens filed on their homes by the ROA as a result of the dispute over the validity of the variances. He also pointed out that the individual plaintiffs had paid approximately $60,000 to another attorney prior to Watt's involvement in the case.

far off of his time. Where the issue comes into play is whether his rate of $450 is reasonable" because he "performs the same services at $300 an hour as he does at $450." Texas courts, however, consistently allow the use of a multiplier to compensate for the uncertainty of recovery in contingent-fee cases. *See Toshiba Mach. Co. v. SPM Flow Control, Inc.*, 180 S.W.3d 761, 783 (Tex. App.—Fort Worth 2005, pet. granted, judgm't vacated w.r.m.); *EMC Mortgage Corp. v. Davis*, 167 S.W.3d 406, 419 (Tex. App.—Austin 2005, pet. denied); *Dillard Dep't Stores, Inc. v. Gonzales*, 72 S.W.3d 398, 413 (Tex. App.—El Paso 2002, pet. denied).

Interim-LV contends that the evidence on attorney's fees is insufficient because Watt testified only to the rates charged and the hours spent without specifically identifying the tasks performed or testifying to the reasonableness and necessity of the time spent on each of those tasks. However, the jury was presented with Watt's testimony that the amount of time spent was reasonable and necessary because it involved, among other things, researching legal issues, working on discovery, participating in hearings, preparing for a trial setting that was later postponed, and preparing for the actual trial. Furthermore, the jury also heard the testimony of opposing counsel, an expert witness on the issue of attorney's fees, that in his opinion, the total amount of time that Watt and his office spent on the case was reasonable. Even without an itemized billing statement or testimony regarding the reasonableness and necessity of the amount of time spent on each particular task, we conclude that the evidence is factually sufficient to establish the reasonableness of the time spent. *See Burnside*, 113 S.W.3d at 898 (upholding fee award absent any itemized billing statement based solely on attorney's testimony regarding his customary hourly rate, total hours spent on case, his experience and expertise, and complexity of case).

Interim-LV also contends that the fees are unreasonable in light of the results obtained. *See Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997) (including "the amount involved and the results obtained" in non-exhaustive list of factors to be considered by fact-finder in determining reasonableness of fee award). Interim-LV takes the position that the plaintiffs have actually gained nothing by their suit because even if their water well variances are declared valid, they have not succeeded in obtaining permission from the county commissioners to drill private water wells on their property.[16] The fact remains, however, that a valid variance from the CCRs' prohibition on private water wells is a necessary first step in obtaining all other required approvals, which the plaintiffs are now free to seek. Further, the record includes copies of emails from the ROA board of directors to the La Ventana community, threatening litigation against any property owners who attempted to rely on the variances, and Crider testified that the ROA filed lis pendens on the homes of a number of the individual plaintiffs, citing the ongoing dispute over the validity of the variances as the basis for doing so. Thus, even if the plaintiffs never obtain the necessary approvals from state and local authorities to drill the water wells, they have, at a minimum, freed themselves and their properties from the specter of litigation by successfully maintaining this declaratory-judgment action. Under the circumstances at hand, we cannot conclude that the fee award was unreasonable in light of the results obtained.

---

[16] To support this position, Interim-LV cites a December 2006 email from Brian Fenske to the La Ventana property owners, stating that he had "been told" that the Hays County Commissioners had denied requests for permission to drill individual water wells by homeowners in other developments. The email goes on to state, "We also understand that the new county commissioners do not support individual wells for developments."

Because we conclude that the evidence is factually sufficient to uphold the reasonableness and necessity of the amount of attorney's fees awarded to the plaintiffs, we overrule Interim-LV's second issue on appeal.

The Individual Homeowners request that, in the event we sustain any of their issues on cross-appeal, this case be remanded to the trial court for a reconsideration of the equitable and just amount of attorney's fees to be awarded to the plaintiffs. *See Bocquet*, 972 S.W.2d at 21 (observing that determination of whether fee award is equitable and just is up to discretion of trial court). Because we have sustained the Individual Homeowners' issues regarding breach of fiduciary duty and the validity of the propane variances, we remand this case to the trial court for the limited purpose of reconsidering the amount of attorney's fees that would be equitable and just in light of the disposition of these issues on appeal.[17]

## CONCLUSION

We reverse the portions of the trial court's judgment declaring that Davis and Crider breached fiduciary duties to La Ventana property owners and that the water well variances granted to Davis and Crider are invalid and/or void and of no force and effect, and render judgment declaring

---

[17] We note also that the trial court's judgment awards appellate attorney's fees in favor of the plaintiffs but does not expressly condition this award on the success of the appeal. Because unconditional appellate fees are improper, such a condition is necessarily implied. *See Solomon v. Steitler*, 312 S.W.3d 46, 59-60 (Tex. App.—Texarkana 2010, no pet.); *see also Houston Livestock Show & Rodeo, Inc. v. Hamrick*, 125 S.W.3d 555, 586 (Tex. App.—Austin 2003, no pet.); *Westech Eng'g Inc. v. Clearwater Constructors, Inc.*, 835 S.W.2d 190, 205 (Tex. App.—Austin 1992, no writ). The trial court will have the opportunity to remedy this issue on remand.

33

the water well variances granted to Davis and Crider to be valid.  We further reverse the portion of the trial court's judgment declaring the propane tank variances to be invalid and/or void and of no force and effect, and render judgment declaring the propane tank variances to be valid.  Finally, we remand for further proceedings on the limited issue of the equitable and just amount of attorney's fees to which the plaintiffs may be entitled.  The remainder of the trial court's judgment is affirmed.

_____

Diane M. Henson, Justice

Before Justices Puryear, Pemberton and Henson

Affirmed in part; Reversed and Rendered in part; Reversed and Remanded in part

Filed:   June 3, 2011