**Appellees' Motion for Rehearing Overruled; Appellees' Motion for En Banc Consideration Denied as Moot; Memorandum Opinion of November 6, 2014 Withdrawn; Affirmed in Part, Reversed and Rendered in Part, and Substitute Memorandum Opinion filed January 22, 2015.**



**In The**

# Fourteenth Court of Appeals

---

## NO. 14-13-00817-CV

---

## WATERFORD HARBOR MASTER ASSOCIATION, Appellant

## V.

## MICHAEL LANDOLT AND ANN WISMER, Appellees

---

**On Appeal from the 56th District Court**
**Galveston County, Texas**
**Trial Court Cause No. 12-CV-2145**

---

## S U B S T I T U T E   M E M O R A N D U M   O P I N I O N

We overrule appellees' motion for rehearing, deny appellees' motion for en banc consideration as moot, withdraw our opinion issued November 6, 2014, and issue this substitute memorandum opinion.

Appellant, Waterford Harbor Master Association ("Waterford"), appeals a final judgment rendered in a suit for declaratory relief and monetary damages filed

by appellees, Michael Landolt and wife, Ann Wismer, ("the Landolts"), and on Waterford's counterclaim for declaratory relief. We affirm in part, and reverse and render in part.

## I. BACKGROUND

Waterford Harbor is a subdivision in Galveston County comprised of different types of residences, a marina, and parks. In 1991, the Landolts purchased a home in the Waterford Oaks section ("the Oaks") of Waterford Harbor. The Oaks is an exclusive, private section within Waterford Harbor; access to this section is through a second gate. Within the Oaks is a park area, ("the Oaks park") which is accessible to residents of Waterford Harbor and the Oaks.

To "create certain easements, [and] . . . assessments . . . in a consistent, compatible, and mutually beneficial manner," the developer promulgated a "Master Declaration of Restrictive Covenants" ("Master Declaration"). The Master Declaration was executed and filed of record in 1991—there is no dispute that it burdens the Landolts' property[1] and applies to all of Waterford Harbor. The Oaks, often referred to as a "sub-association," also promulgated a "Declaration for Waterford Oaks," separate and apart from the Master Declaration. The Oaks Declaration is also filed of record.

Attached to the Master Declaration as Exhibit "B" is the "Waterford Harbor Pro-Rata Share of Reserves."[2] It sets out the total square feet of each Reserve, and the percentage each Reserve represents, as compared to the total square footage of

---

[1] The Master Declaration was to continue through December 31, 2005, and could be extended for one or more periods of ten additional years if approved by a two-thirds vote.

[2] The Master Declaration defines a "Reserve" as "(i) any portion of the Property identified by reserve and block number, reserve letter or similar designation on any recorded Plat of the Property or portion of it, and (ii) each other portion of land contained within the Property which shall be designated as a "Reserve" for the purposes of this Declaration in any amended or supplementary declaration or deed hereafter executed by Declarant."

the subdivision. Exhibit "B" lists the Oaks, designated as Reserve G, as containing 394,254 square feet. The Plat for Waterford Harbor identifies the square footage as 594,254, as does the Declaration specific to the Oaks. The total square footage of the Oaks is part of the calculation for determining the amount of the annual assessment for expenses charged to the particular reserve and how that amount of expenses is charged to each lot owner in Waterford Oaks. Specifically, in the Master Declaration, "Pro Rata Share" is defined to mean:

> (i) each Reserve, the percentage allocated to each Reserve on Exhibit "B" to this Declaration, and (ii) each Owner of a Lot . . ., a fraction, the numerator of which is the number of Net Square Feet in the Lot(s) owned by the Owner in question and the denominator of which is the number of Net Square Feet in the Reserve, excluding all Common Facilities. . . ."

Thus, "Pro Rata Share" is used for two purposes. The first is to calculate the percentage of the Master Association expenses for which each Reserve is responsible; that is, for what percentage of Master Association expenses the Oaks section is responsible. The second is to calculate the amount of the total figure assessed for each Reserve for which each lot owner in that reserve is responsible.[3] The "Pro Rata Share" calculation does not bear on voting.

The Landolts learned of a change to the Oaks square footage figures in 2002. The minutes of Waterford's board of directors reveal that in December 2002, the square footage of the Oaks was changed from the 394,254, as shown on Exhibit "B", to 594,254, as reflected on the Plat of the subdivision and in the sub-association Declaration. Beginning in 2003, Waterford calculated assessments using the 594,294 square feet figure. The Landolts claim their assessment

---

[3] While there are two assessments on the Landolts' property; one for the Master Association, and a separate one for the Oaks sub-association, only the Master Association assessment is at issue.

increased 7-8%. Since that time, the Landolts have paid their assessments "under protest."

In May 2012, Waterford's Master Association called for a vote on three amendments. The first was to amend the Master Declaration to approve the 2002-2003 change to the total square footage of the Oaks. The second was to allow sub-associations (such as the Oaks) to submit petitions to elect their own boards of directors. The third was to increase approval by membership required to amend the Master Declaration from 51% to 67% for purposes of the Pro Rata Share or termination of the covenants. The minutes of Waterford's board of directors meeting in June 2012, show Amendment 1 passed with 52.93%, Amendment 2 received 50.98% approval, and Amendment 3 had 50.40%. Because 51% is required to amend the Master Declaration, only Amendment 1 was approved.

In June 2012, the Landolts received a letter asking homeowners to verify the square footage of the owners' lot, explaining the figures used were taken from the records of the Galveston County Appraisal District ("GCAD"). The letter listed the square footage of the Landolts' property as 35,911. Michael Landolt testified the property was approximately 36,200 square feet.

The Landolts sued Waterford under the Texas Declaratory Judgment Act, seeking a declaration that the "Oaks park" be considered "Common Facilities." This declaration, the Landolts urged, would result in a reduction in the amount of assessment because "Community Facilities" are exempt from inclusion in the calculation on which assessments are based. The Landolts also asked the court to declare that a particular section of property, Reserve A, is a common interest property for every resident of Waterford Harbor, arguing every resident should be allowed to vote a pro rata share of that property. They also asked the court to require Waterford to use the square footage listed on the Plat, and not that listed in

4

the GCAD records, for voting purposes. Finally, the Landolts sought recovery of overpayments on assessments based on the increased square footage due to the 2002-2003 change to the square footage contained in the Plat.

The trial court ordered that the 2002-2003 action of Waterford's board of directors changing the typographical error, correcting the square footage from 394,254 to 594,254, was invalid. The trial court further found the May 2012 vote was invalid because the numbers used were based on the "invalid" 2002-2003 voting numbers. The trial court declared that the "Oaks park" area is not a Common Facility and the trial court rejected that Reserve A should be allocated to the homeowners for purposes of voting. Finally, the trial court awarded the Landolts $16,218.24 (four years of assessments), along with attorneys' fees, pre and post-judgment interest.

Waterford appealed; the Landolts asserted two cross-points.

## II. ANALYSIS

### A. Standard of Review

We review declaratory judgments in the same manner as other judgments. Tex. Civ. Prac. & Rem. Code Ann. § 37.010 (West 2008). We review a trial court's findings utilizing the same standards as a review of a jury's verdict. *See MBM Fin. Corp. v. Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 663 (Tex. 2009) (citing *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994)). When there is a complete reporter's record, the trial court's findings are not conclusive. *See Arrellano v. State Farm Fire & Casualty Co.*, 191 S.W.3d 852, 856 (Tex. App.—Houston [14th Dist.] 2006, no pet.). When there are no findings of fact and conclusions of law, we must infer that the trial court made all findings necessary to support its judgment, and we will uphold those findings if they are supported by

5

sufficient evidence. *Chenault v. Bank*, 296 S.W.3d 186, 198 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (citing *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 83 (Tex. 1992)).

In a legal-sufficiency challenge, we review the record in the light most favorable to the factual findings, crediting favorable evidence if a reasonable factfinder could, and disregarding contrary evidence unless a reasonable factfinder could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We will conclude the evidence is legally insufficient to support a finding only if (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is not more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact. *Id*.

In a factual-sufficiency review, we consider and weigh all of the evidence in a neutral light and set aside the challenged finding only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). We will defer to a trial court's factual findings if they are supported by evidence. *Perry Homes v. Cull*, 258 S.W.3d 580, 598 (Tex. 2008).

When a question of law is at issue, such as the review of an unambiguous restrictive covenant, our review is *de novo*. *See Pilarcik v. Emmons*, 966 S.W.2d 474, 478 (Tex. 1998); *American Gold Corporation v. Colburn*, 65 S.W.3d 277, 279 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (citing *Ostrowski v. Ivanhoe Property Owners Improvement Ass'n*, 38 S.W.3d 248, 253 (Tex. App.—Texarkana 2001, no pet.)). Our primary goal is to ascertain and give effect to the purposes and intent of the language of the restrictive covenant. *See Wiese v. Healthlake*

*Cmty. Ass'n*, 384 S.W.3d 395, 400 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *see also* Tex. Prop. Code Ann. § 202.003(a) (West 2013).

## B. Limitations

Waterford filed a motion for summary judgment, asserting the four-year statute of limitations barred the entirety of the Landolts' suit because they were aware of the change to the restrictive covenants, by way of the change in square footage in 2002-2003; yet, they did not file suit until 2012. The trial court denied the motion as to the entirety of the suit, but ruled the Landolts' recovery should be limited to four years of assessments. Liberally construing Waterford's appellate brief, we conclude that Waterford argues that the evidence conclusively proved that all of the "[Landolts'] lawsuit should be barred by the four-year statute of limitations." *See Perry v. Cohen*, 272 S.W.3d 585, 587 (Tex. 2008) (liberally construing issues presented in appellate brief based on argument section of the brief).

Actions to enforce restrictive covenants are governed by the four-year statute of limitations. *See Storck v. Tres Lagos Property Owners Ass'n, Inc.*, No. 06-13-0006-CV, 2014 WL 3882817, at *11 (Tex.App.—Texarkana, Aug. 8, 2014, no pet. h.), --- S.W.3d --- (citing *Malmgren v. Inverness Frost Residents Civic Club, Inc.*, 981 S.W.2d 875, 877 (Tex. App.—Houston [1st Dist.] 1988, no pet.); *Buzbee v. Castlewood Civic Club*, 737 S.W.2d 366, 368 (Tex. App.—Houston [14th Dist.] 1987, no writ).

The Landolts filed suit after the May 2012 vote to make official the change to the square footage set forth in the Master Declaration. The judgment limited the Landolts' recovery to four years, due to the four-year statute of limitations. We hold Waterford did not conclusively prove that limitations barred the entirety of the Landolts' claim. Therefore, we overrule Waterford's first issue.

## C. Square footage correction

Next, Waterford contends the trial court erred by (1) determining that the 2002-2003 vote to correct the square footage of Reserve G, the Oaks section in which the Landolts live, was invalid, (2) finding the May 2012 vote was invalid, and (3) awarding damages and attorneys' fees to the Landolts.

### 1. Board action in 2002-2003

The Landolts' suit urged the 2002-2003 change violated Section 2.5 of the Master Declaration, which provides: "If *additional* Property is hereafter made subject to or removed from the provisions of this Declaration . . . the Pro Rata Share of an Owner . . . of a Reserve or Lot . . . shall not be increased as a result of the addition of Property without the written consent of that Owner . . . ."

Waterford argued no property was added to the subdivision, and there is no evidence that property was added; therefore, Section 2.5 is inapplicable. Waterford also argued the board's action to correct a typographical error is consistent with the specific language of the Master Declaration and a construction of the entire document. Waterford points out the Plat for Waterford Harbor, incorporated in the Master Declaration, identifies the square footage of Reserve G as 594,254, as does the Declaration specific to the Oaks section. Only Exhibit B attached to the Master Declaration contained the typographical error of 394,254 square feet. There is no evidence the 394,254 figure was accurate, and there is no evidence to contradict the 594,254 figure set forth on the Plat attached to the Master Declaration and on the Oaks Declaration. Further, both parties agreed the Declarations were unambiguous and that they were bound by their terms.

Construing the Master Declaration, and the attached Plat, as well as the Oaks Declaration, it appears the 394,254 square feet figure listed on Exhibit "B" was a

typographical error and the intent of the parties was that the figure to be used for calculation of the assessment was 594,254, not 394,254, square feet. "Typographical errors 'must yield to the well-established doctrine that written contracts will be construed according to the intention of the parties, notwithstanding errors and omissions, by perusing the entire document and to this end, words, names, and phrases obviously intended may be supplied.'" *Edberg v. The Laurel Canyon Ranch Architectural Review Committee*, No. 04-10-00395-CV, 2011 WL 541134, at *4 (Tex. App.—San Antonio Feb. 16, 2011, pet. denied) (mem. op.) (citing *Ussery Invs. v. Canon & Carpenter, Inc.*, 663 S.W.2d 591, 593 (Tex. App.—Houston [1st Dist.] 1983, writ dism'd)) (holding where there were eight references to "Unit 2" and two to "Unit 1," the references to "Unit 1" were typographical errors, which may be corrected); *see also Pilarcik,* 966 S.W.2d at 478 (concluding covenant is examined in light of the circumstances when written).

Additionally, the Landolts included in their original petition that the Plat records referred to the 594,254 figure, and the Landolts urged with respect to the footage shown for their lot in July 2012, the *Plat figures* should have been used, rather than those set out in the GCAD records.  That the Landolts asserted the square footage figures contained in the Plat records should have been used is consistent with the parties' intent, as reflected in the documents, that the Plat and its 594,254 square foot figure would control.

We hold the 2002-2003 action was proper, and we sustain Waterford's second issue.

### 2.    May 2012 vote

The election results reflected Amendment 1 passed with 55.43% approval. The Landolts contend the May 2012 vote, amending the Master Declaration to reflect 594,254 square feet, was invalid for three reasons:  (1) they did not vote

9

because they were out of town; (2) Reserve A was not voted;[4] and (3) incorrect footage was voted. Waterford argue the change in the total square footage for Reserve G bears only on the calculation of assessments and does not affect voting rights, and that the use of GCAD figures for individual lots does not invalidate the 2012 voting.

Voting is governed by Section 3.2 of the Master Declaration and provides for two classes of voting members:

> (a) Class A Members shall be all Members, provided that Declarant shall not be a Class A Member until it ceases to be a Class B Member as provided in Section 3.2(b). Except as otherwise provided on Exhibit "B" to this Declaration or as reallocated as provided in the definition of Pro Rata Share or under Section 2.5, each Class A Member shall be entitled to *one vote for each Net Square Foot of land* contained in the Reserve or Lot *owned by that Member.*

Reallocation is contemplated within the definition of Pro Rata Share. It provides that "the Board may delegate to the Subassociation or Owner(s) of any Reserve or Lot the right to allocate the Pro Rata Share among the Owners within that Reserve or Lot as they determine . . . ." Reallocation under Section 2.5 occurs, as set forth above, only if property is added to the subdivision; there was no addition here. Thus, neither of these provisions is applicable, as there was no allocation within the sub-association, and there was no addition of property.

Michael Landolt testified the May 2012 vote on Amendment 1 did not obtain the requisite percentage approval and that there was never a vote as to their Pro Rata Share. The Landolts rely on Section 11.2 as support:

> *Declarant acting alone* shall have the right to record any amendment required to correct any grammatical, typographical or mathematical error in this Declaration. . . . Notwithstanding the foregoing

---

[4] This point is addressed in the discussion of the Landolts' second cross-point.

provisions, however, any amendment or modification to this Declaration or any supplemental declarations which (i) amends article Three [Voting] or Article Eight [Development and Land Use] of this Declaration or increases the Pro Rata Share of any Owner for the payment of Assessments shall require the vote of a majority of the total eligible votes of each Class of Members of the Association. . . .

(Emphasis added).

Michael Landolt testified the Declarant "acting alone" had the right to correct a typographical error. He also answered "no" when counsel for appellant asked, "It [Master Declaration] doesn't say only the Declarant may correct typographical errors, does it?"

The Landolts further assert that the Reserve A property which was deeded by Declarant to settle the class-action lawsuit should have been voted.[5] This argument ignores the unambiguous language of Section 3.2, which provides that each Class A Member shall be entitled to one vote for each Net Square Foot of land "owned by that Member." Reserve A was never owned by any Member; the terms of the settlement agreement, which Michael Landolt testified they signed, evidence the fact it was deeded to the Master Association.

Finally, the Landolts argue the square footage numbers were inaccurate; specifically, they believed their lot was 36,200 square feet, but the GCAD numbers on which the Landolts were appraised and taxed, showed 35,911. The Landolts argued the discrepancy reduced the number of their votes. In an attempt to obtain an accurate figure, they engaged Dale Hardy, a surveyor who had done work in Waterford Harbor on prior occasions, to review the original plat and to determine accurate square footage values for every lot in the subdivision. While Hardy did not physically perform a survey of the property, he found various differences in the square footage of certain areas contained within Waterford Harbor.

_____

[5] Further analysis relating to Reserve A is included in Section E, *infra*.

The trial court's judgment did not address the issue involving the square footage of the individual lot. Rather, it invalidated the May 2012 vote on the basis of its ruling the 2002-2003 correction was improper. Yet, the May 2012 vote was determined by the votes of the "Net Square Foot" of land under Section 3.2—*not* the number of square feet in the entire Reserve where the Landolts live, which is used to calculate homeowner assessments. The correction to the square footage of the entire Reserve had no bearing on, and changed nothing concerning the voting of, individual lot owners.

Further, even if the Net Square Foot figure were involved in the May 2012 vote, the Master Declaration does not identify the amount of square footage in each individual lot, nor does it specify which number (GCAD or some other) should be used for assessing the homeowner's vote pursuant to Section 3.2. Thus, it would be reasonable to conclude that Waterford could use GCAD figures.

In construing the Declaration, our primary concern is to ascertain and give effect to the intentions of the parties as expressed in the document. *See Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998). To ascertain the parties' true intentions, we examine the entire agreement in an effort to harmonize and give effect to all provisions so that none will be rendered meaningless. *See MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 652 (Tex. 1999). Whether a Declaration is ambiguous is a question of law for the court. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). It is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation. *See id.* However, when a Declaration is worded so that it can be given a certain or definite legal meaning or interpretation, it is unambiguous, and the court construes it as a matter of law. *See Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003). We cannot rewrite the

Declaration or add to its language under the guise of interpretation. *See American Mfrs. Mut. Ins. Co.,* 124 S.W.3d at 162. Rather, we must enforce it as written. *See Royal Indem. Co. v. Marshall*, 388 S.W.2d 176, 181 (Tex. 1965).

The Landolts' position confuses the unambiguous provisions of the Master Declaration. The 2002-2003 change had no bearing on the outcome of the May 2012 vote. Additionally, the Landolts did not vote in that election and offered no evidence to show how, if at all, the difference between the 36,200 square feet Michael Landolt testified they owned and the 39,500 referenced in GCAD records would have impacted the vote to amend the Master Declaration to reflect the 594,254 square footage figure for Reserve G.

We conclude the trial court erred in its finding that the May 2012 vote was invalid due to the correction of the typographical error in 2002-2003, and we sustain Waterford's third issue. Because we hold the 2002-2003 change and May 2012 vote were valid, we sustain Waterford's fourth issue on Landolts' recovery of monetary damages and attorneys' fees.

**D.     Characterization of the "Oaks park"**

In their first cross-point, the Landolts contend the trial court erred in finding "Oaks park," located in the Oaks section of Waterford Harbor, was properly declared as a park. The Landolts assert the park should be considered part of the "Common Facilities" of Waterford Harbor, and thus, exempted from assessment. We disagree.

Article One of the Master Declaration, applicable to all of Waterford Harbor, defines "Common Facilities" as:

> (i) any and all portions of the Property designated on the Plat as private streets, (ii) all Bulkhead, and (iii) such other areas of the property or other property shown on the Plat as Common Facilities . . .

13

.  The Common Facilities are to be held, maintained and operated for the common use and benefit of the Owners."  Nowhere in this section is a park contemplated as part of the "Common Facilities.

The Landolts rely on the language in the Oaks Declaration; that is, the Declaration of the more private, upscale area within Waterford Harbor where the Landolts live.  The Oaks Declaration in Section 1.06, "Community Area" is defined as:

> Those portions of Waterford Oaks specifically designated in the Subdivision Plat as Restricted Reserves A, B, and C, Common Area, or similar designation, the private streets in Waterford Oaks . . . The Community Area may include, without limitation, piers, docks, and other improvements or other facility constructed by the Association or by the Declarant. . . .

First, there is no evidence that Waterford Harbor Master Association owns the Oaks park area.  Rather, Waterford Harbor Oaks Homeowners Association, a "sub-association," has been, and remains, the owner of Reserves A, B, and C, as evidenced on the 1992 warranty deed from the Declarant [Developer] to the association.  Second, the terms "Common Facilities" and "Common Area" are not interchangeable and both derive from different declarations.  In any event, both declarations exempt from assessment all "Common Facilities" and "Common Area."  Additionally, both declarations provide that voting is based on ownership of the individual lot in the subdivisions, pursuant to Section 3.2 of the Master Declaration.

Article Four of the Master Declaration, Section 4.2 provides that assessments shall be made annually and "shall be used for the purpose of promoting the enjoyment and welfare of the Owners and for the maintenance and improvement of the Common Facilities and other portions of the Property . . . ." Section 4.4 provides "Each Owner shall pay its Pro Rata Share of the Association's annual Regular Assessment . . . ." Section 4.11 *exempts* from the Assessments the

14

Common Facilities and all portions of the Property dedicated. Further, the definition of "Pro Rata Share" in the Master Declaration, referred to above, specifically provides the denominator of the fraction to determine an owner's share ". . . is the number of Net Square Feet in the Reserve, *excluding* all Common Facilities."

The Landolts assert here that because the Oaks park is a "Common Area" under the Oaks Declaration, applicable to the Oaks sub-association, and is exempt from assessment under *that* declaration,[6] it also must be considered "common facilities" and be exempt from the Pro Rata Share for assessment under the Master Declaration at issue. There is no evidence to support the Landolts' contention.

There is nothing ambiguous about the language of these restrictive covenants, and the Landolts do not argue the terms are ambiguous. When construing a restrictive covenant, our primary goal is to ascertain and give effect to the intent of its drafters, using the language of the instrument as our guide. *Wiese*, 384 S.W.3d at 400 (citing *Uptegraph v. Sandalwood Civic Club*, 312 S.W.3d 918, 925 (Tex. App.—Houston [1st Dist.] 2010, no pet.) We will afford words and phrases their commonly accepted meanings. *Id*.

Here it is clear the Master Declaration excluded for purposes of calculating the Pro Rata Share only the "Common Facilities" located in Waterford Harbor. The Master Declaration uses only the phrase "Common Facilities" and never refers to "Common Area," as does the Oaks Declaration. Further, Article Ten of the Master Declaration, containing seven sections, deals with "Common Facilities and Easements." It speaks to numerous issues including the use of and title to Common Facilities, restrictions on conveyance, obtaining easements across the

---

[6] Section 7.08 of the Oaks Declaration exempts "Common Area" from calculation of assessments.

Common Facilities, borrowing money to improve or mortgage all or part of the Common Facilities, and parking and access to the Common Facilities. None of the provisions refers to the "Community Area" defined in the Oaks Declaration.

The parties' intent is expressed in the words used, and the words omitted, from each declaration. That the Master Declaration did not include the "Oaks park" as "Common Facilities," which would exempt it from the calculation of the Pro Rata Share under the Master Declaration, evidences the intent that the park be included for purposes of calculating assessments under the Master Declaration. Similarly, that the Oaks Declaration does not refer to "Common Facilities," as it deals with matters of voting and assessments, evidences that the parties intended that Common Area requires different treatment. In short, had the drafters of both the Master Declaration and the Oaks Declaration intended that "Common Facilities" and "Common Area" include the same property, the terms used would have been the same. Because different terms were used, neither of which is ambiguous, all must be construed in light of the entire agreement. *Moran v. Memorial Point Property Owners Association*, 410 S.W.3d 397, 402 (Tex. App.—Houston [14th Dist.] 2013, no pet.). Therefore, we conclude different meanings were intended by the use of different words. Thus, we affirm the trial court's conclusion that the "Oaks park" should be included for purposes of assessment under the Master Declaration and we overrule the Landolts' first cross-point.

## E. Reserve A

In 2001-2002, certain homeowners, including the Landolts, filed a class-action suit asserting claims against the Declarant [developer] for improper or excess assessment of homeowner fees. To settle that suit, the Declarant paid the

16

homeowners $375,000 and deeded Reserve A[7] to the Master Association. Prior to the time it was deeded, the Declarant was voting Reserve A. Once Reserve A was deeded to the Master Association, the Landolts contended it could be included for purposes of voting; however, it was not. The trial court held Reserve A should not have been allocated to all owners for purposes of voting. We agree.

The Master Declaration, Article Three, Section 3.2 limits voting to "one vote for each Net Square Foot of land contained in the Reserve or Lot *owned by that member*." (Emphasis added). The language of this provision is clear and unambiguous. Reserve A was deeded to the Waterford Harbor Master Association, a Texas corporation. Neither the Landolts nor any other resident owns, or has an ownership interest in, any part of Reserve A; therefore, it cannot be included for purposes of voting. The words of Section 3.2 relating to voting "can be given a definite or certain legal meaning," and they must be construed to give them their purposes and intent. *See American Golf Corp.*, 65 S.W.3d 277 at 280. The words require that ownership of property is a prerequisite to voting. Therefore, because the Landolts do not own Reserve A, they cannot vote all or part of the square footage reflected in it. There is no evidence to support the Landolts' position, and they offer no authority to support the proposition that the trial court erred. We overrule the Landolts' second cross-point.

### III. CONCLUSION

Because we conclude that the change in 2002-2003 was to correct a typographical error, and the May 2012 vote was premised on a different basis, we reverse the trial court's judgment insofar as it provides that the 2002-2003 change

---

[7] Reserve A is a portion of the subdivision which originally had been zoned as "light commercial," but was not shown in that manner on the Plat. Michael Landolt testified the owners would not accept the "light commercial" zoning; therefore, the Declarant deeded it to the Master Association to be used for residential purposes.

and the May 2012 vote was invalid.  Therefore, we reverse and render the award of monetary damages and attorneys' fees in favor of the Landolts.  We affirm the trial court's judgment declaring the "Oaks park" area is not a "Common Facility," and rejecting the argument that Reserve A was to be allocated for voting.  We render judgment that Waterford recover attorneys' fees in the amount of $33,263.50, plus an additional $15,000.00 for a successful appeal to the court of appeals, and $15,000.00 for a successful appeal to the Supreme Court of Texas.

/s/    John Donovan
       Justice

Panel consists of Chief Justice Frost and Justices Donovan and Brown.